**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 10 2001**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

ROSE K. SELENKE,

     Plaintiff-Appellant,

v.

MEDICAL IMAGING OF COLORADO,

     Defendant-Appellee.

No. 99-1141

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 98-WY-409-WD)**

---

Hugh S. Pixler, Gregson & Pixler, P.C., Denver, Colorado, for Plaintiff-Appellant.

Christopher M. Leh (Thomas S. Crabb and Mark B. Wiletsky with him on the brief), Caplan and Earnest LLC, Boulder, Colorado, for Defendant-Appellee.

---

Before **KELLY, HENRY**, and **ALARCON,** Circuit Judges.[*]

---

**HENRY**, Circuit Judge.

---

[*] The Honorable Arthur L. Alarcon, Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

Rose Selenke filed this action against Medical Imaging of Colorado (MIC) (her former employer), alleging violations of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12101-12213.[1] Ms. Selenke maintained that MIC failed to reasonably accommodate her sinus disorder, retaliated against her for seeking reasonable accommodation, and then terminated her because of her disability. She also asserted a wrongful discharge claim under Colorado law. The district court granted summary judgment in favor of MIC on all of Ms. Selenke's claims, reasoning that she failed to present sufficient evidence that she suffered from disabilities protected by the ADA or that MIC violated Colorado public policy by terminating her employment.

Mr. Selenke now challenges that ruling. She also argues that, even if the district court properly concluded that she did not suffer from ADA-protected disabilities, that conclusion did not warrant summary judgment on her ADA retaliation claim or her wrongful discharge claim under Colorado law.

For the reasons set forth below, we assume, without deciding, that Ms. Selenke presented sufficient evidence that she suffered from an ADA-protected disability. Nevertheless, even assuming such a disability, the record does not support Ms. Selenke's

---

[1] MIC has filed a motion to substitute itself for Radiology Associates, P.C., as the proper defendant-appellee in this case. The record indicates that the district court granted this relief and that Ms. Selenke has not challenged this ruling on appeal. Accordingly, MIC's motion is granted.

contentions that MIC failed to reasonably accommodate her, terminated her employment because of her disability, or retaliated against her because she engaged in activities protected by the ADA and Colorado law. We therefore affirm the district court's decision.

## I. BACKGROUND

Ms. Selenke worked for MIC as a licensed radiology technician and mammographer from 1990 until 1997. Initially, MIC assigned her to its mobile unit, where she administered mammograms at employers' offices. In 1993, Ms. Selenke requested a transfer, and MIC granted the request, assigning her to its 19th Street office in Golden, Colorado. Ms. Selenke worked there until September 1996, when the company moved the office to Jackson Street. She remained at the Jackson Street office until MIC discharged her in April 1997.

While employed at MIC, Ms. Selenke scheduled patient appointments, administered mammograms, took patient histories, communicated with radiologists regarding test results, and worked with office staff to complete examination reports. Each day, she spent about an hour and a half in the darkroom developing mammography films. From 1990 until early 1996, Lynn Wright was Ms. Selenke's direct supervisor. After that, Karla Schatzer supervised her, and Ms. Wright supervised Ms. Schatzer.

As a teenager, Ms. Selenke began to experience sinus headaches. Doctors

eventually diagnosed her as suffering from chronic sinusitis, which caused congestion and infections, as well as recurring headaches. They also discovered a structural defect in her sinuses. During the period from 1990 to 1993, Ms. Selenke underwent approximately ten endoscopic surgeries in order to improve her condition.

In the fall of 1995, Ms. Selenke complained to Ms. Wright about chemical fumes in the darkroom. Earlier that year, a Food and Drug Administration (FDA) inspection indicated that foreign material was interfering with the reading of mammograms. In response, MIC replaced the darkroom ceiling. Ms. Selenke contended that the new ceiling covered a fresh air vent, causing fumes to remain in the darkroom, and a co-worker expressed the same concerns. When Ms. Wright asked the contractor who had performed the work, he told her that there had never been a fresh air vent in the darkroom.

Ms Selenke continued to complain about the fumes. At the recommendation of her physician, she began wearing a mask when she worked in the darkroom. In January 1996, Ms. Wright consulted an industrial hygienist. His inspection confirmed that the darkroom had inadequate ventilation. Within a week of receiving the hygienist's report, MIC installed a vent.

In April 1996, a dental practice group that shared the 19th Street building with MIC commissioned a study of its indoor air quality. The study concluded that, although there was an odor of acetic acid in the darkroom, it measured at levels below those

4

allowed by the Occupational Health and Safety Administration and did not constitute a safety threat. The air-quality study recommended improvements to the ventilation system. However, around the time that the study was completed, MIC lost its lease on the building. Accordingly, it declined to implement the study's recommendations.

In planning the move to the new facility on Jackson Street, MIC supervisors asked Ms. Selenke for design recommendations. She requested certain ventilation procedures for the darkroom. However, when she visited the new office during construction, she noticed that ventilation was lacking. Ms. Selenke then informed Ms. Wright of the problem. In early September 1996, MIC installed a fresh air vent and an exhaust vent in the darkroom. However, after the vents were installed, Ms. Selenke observed that the darkroom was still not receiving fresh air. After she informed the building manager, he determined that the fresh air vent had been closed and opened it.

Ms. Selenke continued to complain about chemical odors and insufficient ventilation. A co-worker made the same complaints and took a leave of absence because of them. In response, MCI hired a consulting firm to evaluate the darkroom. In early November 1996, the consulting firm conducted airflow testing and then made several recommendations to improve ventilation. MIC followed the recommendations, installing larger fresh air and exhaust vents, a more powerful motor to remove the fumes, and an additional vent near the area where the chemical odor was strongest. In deposition testimony, Ms. Selenke acknowledged that, at that point, MIC had made all the changes

in the ventilation system that she had requested and that those changes were "very, very adequate." Aplt's App. vol. I, at 188.

Nevertheless, Ms. Selenke's sinus condition continued to bother her. In March 1997, her physician suggested testing MIC's Jackson Street facility for molds and spores. Ms. Selenke informed Ms. Wright, who agreed to the testing.[2]

On several occasions during the period from 1995 until April 1997, MIC took disciplinary action against Ms. Selenke. In November 1995, Ms. Wright and Ms. Schatzer placed her on probation for three months, citing errors in her work product and her delay in preparing accreditation documents for MIC. In February 1997, Ms. Wright and Ms. Schatzer presented Ms. Selenke with a written reprimand for making an inappropriate sexual comment to a co-worker. In early April 1997, Ms. Wright and another MIC supervisor met with Ms. Selenke after she became involved in an argument with a receptionist in the waiting room (in front of co-workers and a patient). They told her to watch her temper and requested that she be more tolerant of mistakes by new office staff.

During her tenure with MIC, Ms. Selenke experienced other difficulties with co-workers that were not subject to specific disciplinary action. In her October 1996

---

[2] Ms. Selenke testified that these tests were conducted in April 1997 but that she was not aware of the results. See Aplt's App. vol. III, at 576. Because MIC terminated Ms. Selenke's employment on April 25, 1997, it appears that she did not have time to evaluate these results.

evaluation, Ms. Shatzer observed that Ms. Selenke was "[s]ometimes tactless and unapproachable in dealing with co-workers" and "[o]ccasionally "fail[ed] to respond to direction or suggestions." Aplt's App. vol. I, at 185. She added that her communications with others were sometimes argumentative and negative and that Ms. Selenke needed to develop a more positive attitude toward work and her fellow employees. In December 1996, Ms. Selenke became involved in an argument with a part-time receptionist. The argument could be heard by a patient in the waiting area, and the receptionist testified that she felt degraded and humiliated. In February 1997, the receptionist resigned, citing conflicts with Ms. Selenke.

In mid-April, in front of a co-worker and a patient, Ms. Selenke criticized a receptionist for failing to order a chart. The co-worker later informed the receptionist that she found Ms. Selenke's conduct unprofessional and told her that, if the receptionist did not report it, the co-worker would do so. The receptionist then informed Ms. Wright about Ms. Selenke's outburst.

After receiving this information, Ms. Wright and Ms. Schatzer decided to terminate Ms. Selenke's employment. On April 25, 1997, they met with Ms. Selenke and informed her of the decision. Ms. Selenke refused MIC's offer of severance pay, and her employment ended on that day.

Ms. Selenke filed the instant action in February 1998. As noted above, she alleged that MIC violated the ADA by terminating her because of her disability, by

failing to reasonably accommodate her, and by retaliating against her for engaging in conduct protected by the ADA. She also alleged that MIC's termination of her employment violated the public policy set forth in the Colorado Workermen's Compensation Act, Colo. Rev. Stat. §§ 8-40-101 et seq.

## B. THE DISTRICT COURT'S RULING

In granting summary judgment for MIC, the district court applied one of the ADA's definitions of a disability: "a physical or mental impairment that substantially limits one or more of [an individual's] major life activities." 42 U.S.C. § 12102(2). Noting that Ms. Selenke alleged that her sinusitus impaired the major life activities of working and breathing, the court concluded the evidence presented by Ms. Selenke established a substantial impairment of neither activity.

As to working, the court noted that Ms. Selenke testified that, when MIC terminated her employment, there was no part of her job that she could not perform. Moreover, neither Ms. Selenke's physician nor her retained expert in environmental medicine "opine[d] that [Ms. Selenke] could not perform a class of jobs or a broad range of jobs in various classes at the time she was terminated." Aplt's App. vol. IV, at 987 (Tr. of oral ruling on defendant's motion for summary judgment).

As to breathing, the court observed that Ms. Selenke's experts "[did] not opine that [Ms. Selenke] has any shortness of breadth or other breathing difficulties." Id. at

8

988. The court acknowledged that Ms. Selenke had submitted an affidavit stating that, since 1995, she had experienced various breathing problems. See id. at 805. However, the court further observed that, when asked in her deposition what activities were affected by her disability, Ms. Selenke did not mention breathing but instead referred to working, walking, jogging, cooking, shopping, and socializing. See Aplt's App. vol. III, at 586; vol. IV, at 989. Invoking a Tenth Circuit decision holding that "a plaintiff cannot create a genuine issue of material fact by contradicting her earlier statements," id. vol. IV, at 989 (citing Stanfield v. Osborne Indust., Inc., 52 F.3d 867, 871 n.4 (10th Cir. 1995)), the court discounted the description of breathing difficulties in Ms. Selenke's affidavit. It therefore concluded that the record did not support her contention that she suffered a substantial impairment of her breathing.

As to Ms. Selenke's reasonable accommodation and retaliation claims, the court based its grant of summary judgment to MIC on this same lack of evidence of a disability. It stated that because Ms. Selenke "ha[d] not met her burden of establishing a prima facie case of disability, . . . [MIC] was not obligated to provide her with reasonable accommodation." Id. "Similarly," it stated, "it is incumbent upon [Ms. Selenke] to demonstrate that she is disabled, a critical element in the prima facie ADA case, before she can prove retaliatory discharge." Id.

As to Ms. Selenke's claim for violating Colorado public policy, the court concluded that the record did not support Ms. Selenke's theory that MIC terminated her

9

because she sought medical care. It thus granted summary judgment to MIC on that claim as well.

## II. DISCUSSION

Ms. Selenke first challenges the district court's conclusion that there is insufficient evidence that she suffered from a disability protected by the ADA. She maintains that a reasonable factfinder could conclude that she was substantially impaired in the major life activities of working and breathing. As a result, she asserts, the district court erred in granting summary judgment to MIC on two of her ADA claims: (1) that MIC terminated her employment because of her disability; and (2) that MIC failed to reasonably accommodate her disability.

Next, Ms. Selenke argues, the district court erred in concluding that, in order to prevail on her ADA retaliation claim, she was required to prove that she was disabled. According to Ms. Selenke, a plaintiff may prevail on an ADA retaliation claim as long as she has "'a good faith, reasonable belief that [her] activity is protected by the statute.'" Aplt's Br. at 30 (quoting Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1328 (11th Cir. 1998)). Thus, even if the district court was correct in finding insufficient evidence that she was disabled, summary judgment on her retaliation claim is not warranted.

Finally, Ms. Selenke challenges the district court's grant of summary judgment on her state law claim for violation of the Colorado Workers' Compensation Act. She

10

maintains that there is sufficient evidence in the record from which a jury could conclude that MIC terminated her employment because she sought medical care for her sinusitis.

We review de novo the district court order's granting summary judgment. Cooperman v. David, 214 F.3d 1162, 1164 (10th Cir. 2000). Summary judgment is warranted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "When applying this standard, we view the evidence and draw reasonable inferences therefrom in the light most favorable to the nonmoving party." Cooperman, 214 F.3d at 1164.

For the reasons set forth below, Ms. Selenke's first argument—that she presented sufficient evidence that she suffered from an ADA-protected disability—presents a close question. We therefore assume, without deciding, that Ms. Selenke suffered from such a disability during her employment with MIC. In spite of this assumption, we conclude for the following reasons that the district court's grant of summary judgment to MIC was proper on each of Ms. Selenke's claims.

First, as to Ms. Selenke's discriminatory discharge claim, MIC presented evidence that it terminated Ms. Selenke's employment for legitimate reasons unrelated to her disability. Ms. Selenke failed to present evidence indicating that these reasons were pretextual. As to her claim for failure to accommodate, the record establishes that MIC

11

did provide Ms. Selenke with reasonable accommodations. As to her claim that MIC retaliated against her for engaging in conduct protected by the ADA, Ms. Selenke has failed to rebut MIC's evidence establishing a legitimate basis for the allegedly retaliatory actions. Finally, as to her state law claim, Ms. Selenke also failed to present sufficient evidence from which a factfinder could conclude that MIC discharged her because she sought medical care.

### A. Substantial Impairment of Major Life Activities

The ADA protects employees from discrimination on the basis of a disability. See 42 U.S.C. § 12112(a) (stating that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment"). It defines a disability as "a physical or mental impairment that substantially limits one or more of [an individual's] major life activities"; "a record of such impairment"; or "being regarded as having such an impairment." 42 U.S.C. § 12102(2).[3]

In light of this definition, the determination of whether an individual is protected

---

[3] In this case, Ms. Selenke alleges that she has a disability, and we therefore apply the first of these definitions.

by the ADA generally involves three inquiries:  (1) determining whether the individual has an impairment or a record of impairment or is regarded as having such impairment; (2) identifying the activities the individual alleges to be affected by the impairment and determining whether they constitute "major life activities" under the ADA; and (3) determining whether the impairment substantially limits the major life activity.  Doyal v. Oklahoma Heart, Inc., 213 F.3d 492, 495-96 (10th Cir. 2000).   "[A] plaintiff must specifically plead or prove at trial the impairments and the major life activities he or she asserts are at issue."  Poindexter v. Atchison, Topeka & Santa Fe Ry. Co., 168 F.3d 1228, 1230  (l0th Cir. 1999).

In this case, Ms. Selenke asserted that she was impaired in the major life activities of working and breathing.  MIC does not dispute that Ms. Selenke has sinusitus or that working and breathing are "major life activities" under the ADA.  See Doyal, 271 F.3d at 495 (stating that "'[m]ajor life activities' include such functions as . . . breathing . . . and working").  Thus, the parties' dispute involves the third part of the inquiry—whether Ms. Selenke's sinusitis substantially impaired her working and breathing.

1. Working

With regard to working, we agree with the district court's analysis.  "[T]o demonstrate that an impairment 'substantially limits' the major life activity of working, an individual must show significant[ ] restrict[ion] in the ability to perform either a class

13

of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities." Bolton v. Scrivner, Inc., 36 F.3d 939, 942-43 (10th Cir. 1994) (quoting 29 C.F.R. § 1630.2(j)(3)(i) (emphasis added)). "'[T]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'" Sutton v. United Air Lines, Inc., 130 F.3d 893, 904 (10th Cir. 1997) (quoting 29 C.F.R. § 1630.2(j)(3)(i)), aff'd, 527 U.S. 471 (1999). Here, Ms. Selenke acknowledged that, at the time she was employed by MIC, she was able to perform all the duties that her job required. See Aplt's App. at 208. Although her physician eventually concluded that she could no longer work as a mammographer, that determination was based on her condition after the termination of her employment. Similarly, the testimony of her expert physician—that "she should be provided with an environment free of exposure to perfumes, colognes, cleaning products, photocopier fumes, and other sources of chemical exposure in her work environment," see id. vol. III at 653—was based on an August 10, 1998 evaluation, more than fifteen months after she left MIC. Thus, there is no evidence in the record from which a reasonable factfinder could conclude that, at the time of her employment with MIC, Ms. Selenke was unable to perform "either a class of jobs or a broad range of jobs in various classes as compared to the average person." See 29 C.F.R. § 1630.2(j)(3)(i)).[4]

---

[4] The Interpretative Guidance to 29 C.F.R. § 1630.2(j) provides an example of an individual with an impairment resembling the one with which Ms. Selenke was eventually diagnosed (in the August 10, 1998 evaluation). It states, "[S]uppose an individual has an

## 2. Breathing

Whether Ms. Selenke presented evidence that she had a substantial impairment in the major life activity of breathing presents a much closer question. She alleged in her first amended complaint that, while employed at MIC, she suffered "physical problems such as headaches, dizziness, fatigue, breathing difficulties, burning eyes and related symptoms of sinusitus and chemical exposure as a result of the chemicals and lack of proper ventilation." Aplts App. vol. I, at 13 (emphasis added). After giving her deposition and in response to MIC's motion for summary judgment, Ms. Selenke submitted an affidavit describing breathing problems that she had suffered since 1995.[5]

Unlike the district court, we are not convinced that Ms. Selenke's failure to mention these problems at her deposition precludes consideration of her affidavit.

---

allergy to a substance found in most high rise office buildings, but seldom found elsewhere, that makes breathing extremely difficult. Since this individual would be substantially limited in the ability to perform a broad range of jobs in various classes that are conducted in high rise office buildings within the geographical area to which he or she has reasonable access, he or she would be substantially limited in working." 29 C.F.R. § 1630.2(j) App.

Because Ms. Selenke did not present evidence indicating that she suffered from such a disability during the period that she worked at MIC, we do not apply this provision. However, this section of the Interpretative Guidance does suggest that difficulties such as those suffered by Ms. Selenke may affect the major life activity of working in certain circumstances.

[5] These problems included "shortness of breath, especially when exposed to chemical smells in my dentist's office and stores, from copier machines and computer printers, insecticide sprays, and from colognes and perfumes and smoke." Aplt's App. vol. IV, at 805. She added that she had experienced "considerable muscle pain in my chest and back from difficulty breathing when so exposed." Id.

15

Although an affidavit that contradicts earlier sworn testimony should be disregarded if it "constitutes an attempt to create a sham fact issue," Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986), that principle is not applicable when the deposition testimony is ambiguous and the affidavit assists in clarifying it. See id. (stating that the court should consider "whether the earlier testimony reflects confusion which the affidavit attempts to explain"); Videon Chevrolet, Inc. v. General Motors Corp., 992 F.2d 482, 487 (3d Cir. 1993) (concluding that, in light of ambiguous deposition testimony, it was proper to consider an affidavit and noting that"[t]o hold that such a semantic misstep from a witness untrained in the law effectively ends his case would only bring back the sporting theory of justice and open the door to sharp practices by counsel"); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1297 (7th Cir. 1993) (noting that "[a] subsequent affidavit may be used to clarify ambiguous or confusing deposition testimony").

On the issue of her breathing difficulties, Ms. Selenke's deposition testimony is somewhat unclear. At the deposition, MIC's attorneys asked her "what activities in your life have been affected by your disability?" Aplt's App. vol. III, at 586. When Ms. Selenke asked him if he was referring to social activities, the lawyer replied, "It's your call, what kind of activities in your life." Id. Even though court decisions and administrative regulations group together as "major life activities" such disparate acts as "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, sleeping, sitting, standing, lifting, reaching, and working," see

16

Doyal, 213 F.3d at 495, it does not necessarily follow that a deponent such as Ms. Selenke would understand that the word "activity" included a basic physiological function such a breathing—particularly when she asked for clarification of the term and the attorney refused to provide it. Thus, in light of the ambiguity of her deposition testimony, it is questionable whether her affidavit should have been disregarded.

Moreover, as Ms. Selenke observes, several courts have concluded that breathing difficulties may constitute an impairment of a major life activity. See, e.g., Homeyer v. Stanley Tulchin Assocs., Inc., 91 F.3d 959, 962 (7th Cir. 1996) (concluding that there were factual questions as to whether the plaintiff's chronic allergic rhinitis and sinusitus substantially limited her ability to breath and work); Treadwell v. Dow-United Tech., 970 F. Supp. 962, 972 (M.D. Ala. 1997) (finding "evidence sufficient to create a jury question as to whether her major life activity of breathing has been substantially impaired . . . by her alleged sensitivity to chemicals"); Whillock v. Delta Air Lines, 926 F. Supp. 1555, 1561-63 (N.D. Ga. 1995) (concluding that evidence of plaintiff's hypersensitivity to certain chemicals created a factual question as to whether her breathing was substantially impaired). Ms. Selenke's contention that her breathing difficulties constitute a protected disability also finds some support in the Supreme Court's decision in Bragdon v. Abbott, 524 U.S. 624 (1998). There, the court held that an individual's HIV infection constituted a substantial impairment of the major life activity of reproduction, even though "[c]onception and childbirth are not impossible for an HIV

17

victim." Bragdon, 524 U.S. at 641. That holding followed from the significant health risks associated with such reproduction. See id. (stating that the ADA "addresses substantial limitations on major life activities, not utter inabilities"). Here, the record contains evidence that Ms. Selenke's sinusitus affected her breathing by causing her increased health risks upon exposure to certain conditions in the darkroom.

For all these reasons, we will assume, without deciding, that Ms. Selenke presented sufficient evidence that she suffered from a substantial impairment of the major life activity of breathing while employed by MIC. We now turn to the other elements of Ms. Selenke's claim for discriminatory discharge under the ADA.


B.  Claim for Discriminatory Discharge

If an individual has a protected disability, she may establish prima facie case of discriminatory discharge under the ADA by demonstrating that: (1) she was qualified, with or without reasonable accommodation, to perform the essential functions of her job; and (2) her employer terminated her employment under circumstances giving rise to an inference that the action was based on her disability. See Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir. 1997). In order to establish this final element, the plaintiff must "present some affirmative evidence that disability was a determining factor in the employer's decision." Id. (citing Ennis v. National Ass'n of Bus. & Educ. Radio, Inc., 53 F.3d 55, 59 (4th Cir. 1995))  This burden is "not onerous," but it is also "not empty

18

or perfunctory." Id. (internal quotation marks omitted).

If the plaintiff establishes a prima facie case of ADA discrimination, the burden shifts to the employer to offer a legitimate, nondiscriminatory reason for the challenged action. See Butler v. City of Prairie Village, Kan., 172 F.3d 736, 747 (10th Cir. 1999) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973)). If the defendant articulates such a reason, then the plaintiff may prove that it is merely a pretext for unlawful discrimination on the basis of her disability. Id. At all times, the plaintiff retains the ultimate burden of proving such discrimination. Id.

In this case, MIC argued that it was entitled to summary judgment because it provided a legitimate reason for Ms. Selenke's discharge—her repeated conflicts with other employees (some of which were witnessed by patients). MIC offered evidence in support of that contention, primarily the affidavits and deposition testimony of Ms. Selenke's supervisors (Ms. Shatzer and Ms. Wright). As noted above, the supervisors explained that between December 1996 through April 1997, three different employees complained about Ms. Selenke's conduct. One resigned, citing Ms. Selenke's conduct as the reason, and the supervisors were concerned about losing other employees. On appeal, MIC contends that, even if the district court erred in concluding that Ms. Selenke was not protected by the ADA, this legitimate reason for the termination of her employment nevertheless establishes that it is entitled to summary judgment on her

discrimination claim.[6]

In response to MIC's summary judgment motion, Ms. Selenke did not offer evidence rebutting the MIC supervisors' testimony that she became involved in conflicts with three other employees during the months preceding her termination. Instead, she challenged MIC's contention that these incidents provided a legitimate basis for discipline and, ultimately, for termination. She reasserts that argument on appeal.

In particular, Ms. Selenke contends that the employee with whom she argued in December 1996 (about the need to complete paperwork before conducting a mammogram) overreacted to the incident. She asserts that the employee had problems with interpersonal relationships and had difficulty following instructions. As to the second incident (in February 1996), Ms. Selenke points to evidence that the employee to whom she made an offensive comment herself made sexually explicit remarks in the workplace. Finally, Ms. Selenke notes that she apologized to the receptionist with whom she argued in April 1997 and that the receptionist was encouraged to complain to MIC supervisors by a third employee.

Ms. Selenke also cites testimony from other employees suggesting that it was Ms. Wright who incited conflicts with her. She notes that these employees observed that Ms.

---

[6] Because Ms. Selenke was afforded an opportunity to respond to MIC's evidence, we may consider MIC's argument as an alternative ground for affirming the district court's judgment. See Bolden v. PRC Inc., 43 F.3d 545, 548 (10th Cir. 1994) (stating that appellate court may affirm summary judgment on alternative grounds, as long as the grounds are supported by the record).

Wright "badgered" and "picked on" her and "thrived on" causing her to "bounce off the walls." See Aplt's Reply Br. at 22 (quoting Aplt's App. vol. III at 738-39, vol. IV at 781).

Finally, Ms. Selenke argues that the timing of her termination suggests that MIC acted with discriminatory intent. She notes that, in an effort to determine the cause of Ms. Selenke's continuing sinus problems, her physician suggested in late March 1997 that MIC test its offices for molds and spores. She relayed this request to Ms. Wright. According to Ms. Selenke, the fact that MIC discharged her less than a month after she again raised the issue of her breathing difficulties is evidence that it discriminated against her on the basis of her disability.

Upon review of the record, we conclude for several reasons that the district court's grant of summary judgment to MIC on Ms. Selenke's ADA discriminatory discharge claim was proper. First, although we agree with Ms. Selenke that the timing of her discharge—within a month of her request for additional testing of her work environment—provides some support for her claim, that evidence indicates at most that she has established a prima facie case. See Butler, 172 F.3d at 752 (noting that "protected conduct closely followed by adverse action may justify an inference of retaliatory motive") (internal quotation marks omitted). However, when a defendant articulates a reason for terminating the plaintiff's employment, establishing a prima facie case is not sufficient to avoid summary judgment. Instead, the plaintiff must offer

21

evidence that the defendant's reason is a pretext for discrimination. See Connor v. Schnuck Markets, Inc., 121 F.3d 1390, 1396 (10th Cir. 1997) (stating that "even though a plaintiff has established a prima facie case, the defendant is entitled to summary judgment unless the plaintiff produces either direct evidence of discrimination or evidence that the defendant's proffered reason for the action taken was pretextual"); see also Anderson v. Coors Brewing Co., 181 F.3d 1171, 1179 (10th Cir. 1999) (affirming grant of summary judgment to an employer because, even assuming that the plaintiff established a prima facie case, she could not prove that the proffered reason for terminating her was pretextual).

We therefore turn to Ms. Selenke's contention that the reasons given by MIC for her termination were a pretext for discrimination. When assessing a contention of pretext, we examine the facts "as they appear to the person making the decision to terminate [the] plaintiff." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1231 (10th Cir. 2000); see also Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1209 (10th Cir.1999) (noting that it is the manager's perception of the employee's performance, and not the employee's subjective evaluation of her performance, that is relevant in determining pretext) (internal quotation marks omitted). We may not second guess the business judgment of the employer. Simms v. Oklahoma ex rel. Dept. of Mental Health & Sustance Abuse Servs., 165 F.3d 1321, 1330 (10th Cir.), cert. denied, 528 U.S. 815 (1999). Instead, the relevant question is whether the reason articulated by the employer

22

was the real reason for the challenged action.

Applying these principles, we conclude that Ms. Selenke has failed to offer evidence from which a reasonable factfinder could conclude that MIC's reasons for terminating her employment were pretextual. Her efforts to minimize the significance of her conflicts with her co-employees merely establishes that her view of appropriate management contrasts with that of MIC's supervisors. Similarly, the testimony of other employees that Ms. Wright incited conflicts with Ms. Selenke does not constitute evidence of discriminatory motive. Ms. Selenke presented no evidence that Ms. Wright treated Ms. Selenke differently than other employees with similar difficulties in performing their jobs or that Ms. Wright's treatment of her was based on her disability rather than a personality conflict or other factors. See Hawkins v. Pepsico, Inc., 203 F.3d 274, 280-81 (4th Cir. 2000) (concluding that evidence of a personality conflict between the plaintiff and a supervisor did not constitute evidence of racial discrimination); Pilgrim v. Trustees of Tufts College, 118 F.3d 864, 871 (1st Cir. 1997) (concluding that evidence of "a clash of personalities" was insufficient evidence of racial and national origin discrimination); Archuleta v. Colorado Dept. of Inst., 936 F.2d 483, 487-88 (10th Cir. 1991) (concluding that evidence that the plaintiff had personality conflicts with several co-workers constituted insufficient evidence that the defendant had a retaliatory motive). Accordingly, the record supports the district court's grant summary judgment to MIC on Ms. Selenke's claim for discriminatory discharge under the ADA.

C.  Claim for Failure to Reasonably Accomodate

Under the ADA, discrimination is defined to include "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity."  42 U.S.C. § 12112(b)(5)(A).  The statute thus establishes a cause of action for disabled employees whose employers fail to reasonably accommodate them.  See, e.g., Templeton v. Neodata Servs., Inc, 162 F.3d 617 (10th Cir. 1998) (assessing employee's claim that employer failed to reasonably accommodate her).  However, an employer is not required to always provide the employee with the best possible accommodations or in the specific manner the employee requested.  See 29 C.F.R. § 1630.2(p)(1). It has broad discretion in determining which alternative accommodation should be provided. See 29 C.F.R. § 1630.9.

Here, Ms. Selenke asserted that MIC failed to reasonably accommodate her sinus disorder by failing to make timely modifications in her work environment.  In its motion for summary judgment, MIC argued that, assuming that Ms. Selenke suffered from a disability protected by the ADA, it complied with the statute by improving ventillation in the darkrooms, providing her with a mask, granting her requests for leaves of absence, and offering her a position in the mobile unit.  MIC argues on appeal that the district court's grant of summary judgment may be affirmed on this alternative ground (i.e., that

24

it reasonably accommodated Ms. Selenke's disability).

Under the ADA, reasonable accommodations may include: " making existing facilities used by employees readily accessible to and usable by individuals with disabilities; and . . . job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities. 42 U.S.C. § 12111(9). In this case, the parties agree that MIC did modify Ms. Selenke's work environment: it hired an industrial hygienist who evaluated the darkroom at the 19th Street office; it followed his recommendation to install a vent; at the Jackson Street office, it hired a consulting firm and followed its recommendations to install vents and a more powerful motor to remove the fumes.

Nevertheless, Ms. Selenke argues that MIC violated the ADA because it delayed making these changes. In particular she notes that, even though she complained about a lack of ventilation in the 19th Street darkroom in the fall of 1995, MIC did not insert a vent until February 1996. She also cites delays in making improvements at the Jackson Street office, observing that even though MIC moved to that office in September 1996, it was not until late November of that year that MIC completed the repairs to provide adequate ventilation. Ms. Selenke also notes that, at the Jackson Street facility, MIC declined to make certain improvements recommended by a consultant in April 1996.

Although our circuit has not yet addressed the question in analogous

25

circumstances, a few courts have concluded that an employer's delay in providing reasonable accommodation may violate the ADA. See, e.g., Krocka v. Riegler, 958 F. Supp. 1333, 1342 (N. D. Ill. 1997) (holding that "an unreasonable delay in implementing a 'reasonable accommodation' can constitute a discriminatory act" and refusing to dismiss a claim that an eight-month delay in assigning an employee to the desired shift constituted a failure to reasonably accommodate); cf. Terrell v. USAir, 132 F.3d 621, 627 (11th Cir. 1998) (affirming grant of summary judgment to an employer on employee's claim that it violated the ADA by failing to provide her with a special keyboard for three months and reasoning that the plaintiff "had some access" to the keyboard during that time and "was not required to type when she had no access"); Hartsfield v. Miami-Dade County, 90 F. Supp. 2d. 1363, 1371-73 (S.D. Fla. 2000) (granting summary judgment on employee's claim that ten-month delay in providing special equipment and training violated the ADA and holding that "[w]here an accommodation is delayed an employer does not violate the ADA, as long as the employee receives some other accommodation or at least does not suffer adverse employment action"); Powers v. Polygram Holding, Inc., 40 F. Supp. 2d 195, 202 (S.D. N.Y. 1999) (granting employer's motion for summary judgment on employee's claim that a three-week delay in granting a request for reduced hours violated the ADA); see generally Anderson v. Ross Stores, Inc., No. C 99-4056 CRB, 2000 WL 1585269, at *8 (N.D. Cal. Oct. 10, 2000) (collecting cases). In assessing these claims, courts have

considered the following factors: the length of the delay, the reasons for the delay, whether the employer has offered any alternative accommodations while evaluating a particular request, and whether the employer has acted in good faith.

Applying these standards, we conclude that MIC is entitled to summary judgment on Ms. Selenke's claim for failure to reasonably accommodate her. As to the delay in installing the vent in the darkroom at the 19th Street office, MIC has presented evidence that, when she received Ms. Selenke's complaints, Ms. Wright contacted the contractor who had replaced the ceiling. He informed her that the vent had not been removed from the darkroom. Although the contractor was incorrect, Ms. Selenke has presented no evidence indicating that Ms. Wright's initial reliance on the contractor was unreasonable. Moreover, when Ms. Selenke continued to complain, MIC retained an industrial hygienist to evaluate the darkroom and followed his recommendations by installing a vent. Additionally, MIC provided Ms. Selenke with another accommodation: it paid for a respirator mask for her to wear in the darkroom. Finally, there is no indication that MIC refused any requests for leave from Ms. Selenke during this time. Cf. Hartsfield, 90 F. Supp. 2d at 1373 (noting that the plaintiff was allowed breaks and leave time while awaiting the requested accommodation).

With regard to the alleged delay in implementing modifications at the Jackson Street office, the evidence is similar. In the fall of 1996, after receiving MIC's complaints, MIC hired a consulting firm to conduct air-flow testing. It followed the

consultant's recommendations. Ms. Selenke acknowledged that, by late November 1996, MIC had made all the changes in the darkroom that she had requested. Moreover, during this period, MIC allowed Ms. Selenke to take leave. It also offered her an alternative position in the mobile unit, one in which she would not be required to work with darkroom chemicals. Although Ms. Selenke submitted a letter from her physician that he "would not consider the assignment of [Ms. Selenke] to a Mobile Radiology Unit to allow convalescence to occur," Aplt's App., vol IV. at 775, that statement does not indicate that MIC's offer was unreasonable. The offer of a position in the mobile unit was for a permanent transfer, not for a period of convalescence. Moreover, it presented uncontroverted evidence that it had reduced the physical demands of the mobile unit job. Cf. Terrell, 132 F.3d 627 (noting availability of alternative accommodations in concluding that employer's delays were not unreasonable).

The other instance of MIC's alleged failure to take action also does not support Ms. Selenke's reasonable accommodation claim. Although MIC acknowledges that it did not implement the improvements to the ventilation system recommended in the April 1996 consultant's report, Ms. Selenke has failed to submit any evidence indicating that MIC's decision was driven by bad faith, as opposed to a practical concerns about substantial expenditures on an office that it would be vacating in several months because its lease had been terminated. Significantly, this consultant's report concluded that the chemical concentrations in the darkroom were "well below current allowable levels."

28

Aplt's App. vol. IV at 768.  Although the consultant suggested additional modifications to the ventilation system, the ADA requires an employer to provide a "reasonable accommodation, not the accommodation [the employee] would prefer." Rehling v. City of Chicago, 207 F.3d 1009, 1014 (7th Cir. 2000).  Ms. Selenke presented no evidence indicating that, after replacing the vent in February 1996, MIC acted unreasonably by declining to follow the suggestions in the April 1996 consultant's report and deciding instead to wait to make further improvements after moving to the new facility.

We therefore conclude that MIC acted reasonably in implementing modifications to its 19th Street and Jackson Street offices, granting Ms. Selenke's leave requests, providing her with a respirator mask, and offering her an alternative position in the mobile unit.  The district court's grant of summary judgment to MIC on her failure-to-accommodate claim is thus warranted on this alternative ground not reached by the district court.

### D.  Retaliation Claim

The ADA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of . . . any right granted or protected by this chapter." 42 U.S.C. § 12203(b).  Under the ADA, an employee must prove the following elements in order to establish a prima facie case of retaliation:  (1) that she engaged in an activity protected by the statute; (2) that "she was subjected to [an]

29

adverse employment action subsequent to or contemporaneous with the protected activity;" (3) that there was a causal connection between the protected activity and the adverse action. Anderson, 181 F.3d at 1178. As with claims for discriminatory discharge, if the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action. If the employer satisfies this burden of production, then, in order to prevail on her retaliation claim, the plaintiff must prove that the employer's articulated reason for the adverse action "'is pretextual, i.e. unworthy of belief.'" Id. at 1177 (quoting Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th Cir.1997)).

Here, the district court concluded that, because Ms. Selenke was not disabled under the ADA, she could not pursue a retaliation claim. However, in order to prosecute an ADA retaliation claim, a plaintiff need not show that she suffers from an actual disability. Instead, a reasonable, good faith belief that the statute has been violated suffices. See Standard v. A.B.E.L Servs., Inc, 161 F.3d 1318, 1328 (11th Cir. 1998) ("[T]o satisfy the first element of the prima facie case, it is sufficient that an employee have a good faith, objectively reasonable belief that his activity is protected by the statute."); Krouse v. American Sterilizer Co., 126 F.3d 494, 502 (3d Cir. 1997) ("Unlike a plaintiff in an ADA discrimination case, a plaintiff in an ADA retaliation case need not establish that he is a 'qualified individual with a disability.' By its own terms, the ADA retaliation provision protects 'any individual' who has opposed any act or practice made

30

unlawful by the ADA.") (quoting 42 U.S.C. § 12203(a)); see also Love v. RE/MAX of Am., Inc., 738 F.2d 383, 385 (10th Cir. 1984) (concluding that a good faith belief that Title VII has been violated is sufficient to support a retaliation claim).

With regard to her retaliation claim, Ms. Selenke now argues that, in light of the district court's erroneous interpretation of the elements of an ADA retaliation claim, that claim should be remanded for trial. MIC counters that, in spite of the district court's error, it is still entitled to summary judgment on that claim. In particular, MIC contends that there is insufficient evidence of two of the required elements: that Ms. Selenke had a reasonable, good faith belief that the statute had been violated and that there was a causal connection between the protected activity and the adverse employment action.

MIC's first argument is undermined by the evidence in the record regarding the breathing difficulties caused by Ms. Selenke's sinusitis, as well as case law concluding that similar disorders may constitute protected disabilities. See, e.g., Homeyer, 91 F.3d at 962; Treadwell, 970 F. Supp. at 972; Whillock, 26 F. Supp. at 1561. That evidence and case law supports the conclusion that Ms. Selenke had a reasonable, good faith belief that she was disabled under the ADA.

Moreover, modification of the work environment constitutes one kind of reasonable accommodation authorized by the ADA. See 42 U.S.C. § 12111(9) (defining reasonable accommodation to include "making existing facilities . . . usable by individuals with disabilties" and "modification of equipment or devices," and "other

31

similar accommodations"); 29 C.F.R. § 1630.2 (defining reasonable accommodation to include "[m]odifications or adjustments to the work environment, or to the manner or circumstances in which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position). Thus, the record also contains evidence suggesting that Ms. Selenke's requests for improvements to the ventilation system are protected by the statute. See Butler, 172 F.3d at 752 (concluding that there were factual questions as to whether an employer retaliated against the plaintiff for requesting accommodation for his disability and remanding an ADA retaliation claim for trial).

Nevertheless, MIC's second challenge to Ms. Selenke's retaliation claim is well-founded: the record contains insufficient evidence of a causal connection between Ms. Selenke's requests for reasonable accommodation and the adverse employment actions taken against her. We reach this conclusion by examining the occurrences that Ms. Selenke characterizes as "adverse employment actions" and then considering the evidence that she invokes to support her contention that these actions were prompted by her accommodation requests.

In her reply brief, Ms. Selenke lists the following adverse employment actions: MIC's placing her on probation on November 19, 1995; its delay in replacing the darkroom vent at the 19th Street office and its refusal to make additional improvements suggested in the consultant's April 1996 report; its delay in installing an adequate

ventillation system in the Jackson Street office; and its termination of her employment in April 1997. Our analysis of Ms. Selenke's discriminatory discharge and reasonable accommodation claims disposes of all but the first of these allegedly retaliatory actions. For the reasons set forth above, the record establishes legitimate, nondiscriminatory reasons for MIC's termination of Ms. Selenke's employment and further establishes that MIC acted reasonably in response to her requests for modification of the 19th Street and Jackson Street offices. Thus, we turn to Ms. Selenke's allegation that there is evidence that MIC acted with a retaliatory motive in placing her on probation on November 19, 1995, more than sixteen months before her eventual discharge.

In support of that contention, Ms. Selenke relies on a March 22, 1996 memorandum that she submitted to her supervisors. In that memorandum, she contended that MIC's November 1995 disciplinary action was not justified. She explained the steps that she took to address the quality problems with mammograms at the 19th Street office. She added that MIC supervisors had not provided her with adequate training or assistance in resolving these problems. She did acknowledge that she had made an "honest mistake" in numbering film. Aplt's App. vol. III, at 740-43.

As additional evidence of retaliatory motive, Ms. Selenke points to the timing of the disciplinary action. She notes that she first began to complain about the removal of the vent from the 19th Street darkroom in the fall of 1995 and that MIC placed her on probation in November of that year. According to Ms. Selenke, this temporal proximity

33

suggests that MIC took an adverse employment action against her because she sought a reasonable accommodation of her disability.

Ms. Selenke's argument is undermined by the lack of corroboration of her perception of her work performance. She offered no evidence from other witnesses that she was performing her job adequately and that MIC's action was not justified. As we have noted, "it is the manager's perception of the employee's performance that is relevant, not plantiff's subjective evaluation of [her] own relative performance." Furr v. Seagate Tech., Inc., 82 F.3d 980, 988 (10th Cir. 1996). Particularly in light of her admission that she made an "honest mistake," Aplt's App. vol. III, at 741, Ms. Selenke's memorandum provides no grounds for us to second-guess the decision of MIC management that a period of probation was warranted. See Simms, 165 F.3d at 1330 (noting that the court's role is to "prevent unlawful hiring practices, not to act as a super personnel department that second guesses employer's business judgments") (internal quotation marks omitted).

Finally, although MIC placed Ms. Selenke on probation shortly after she first complained about inadequate ventilation in the darkroom, that fact establishes only her prima facie case. As noted above, such temporal proximity is insufficient, standing alone, to create an issue of fact as to whether MIC's explanation of the grounds for the disciplinary action was pretextual See Connor , 121 F.3d at 1396 (stating that, even though a plaintiff has established a prima facie case, in order to avoid summary judgment

34

she must produce either direct evidence of an improper motive or or evidence that the defendant's proffered reason for the action taken was pretextual).

Accordingly, we conclude that Ms. Selenke failed to offer sufficient evidence from which a reasonable factfinder could conclude that there was a causal connection between MIC's adverse employment actions and her requests for reasonable accommodation. Thus, summary judgment in favor of MIC and against Ms. Selenke is warranted on her retaliation claim.

### E. State Law Claim

Finally, Ms. Selenke argues that the district court erred in granting summary judgment on her wrongful discharge claim under Colorado law. She maintains that there is evidence indicating that she was fired because she sought medical assistance. She relies on Miedema v. Browning-Ferris, Indus., 716 F. Supp. 1369, 1373 (D. Colo. 1989), in which the court concluded that a plaintiff may assert a wrongful discharge claim in "situations in which [she] has been fired in retaliation for seeking medical assistance before filing a worker's compensation claim."

The evidence that we have discussed above forecloses Ms. Selenke's state law claim. Because MIC articulated legitimate, non-discriminatory reasons for terminating her employment and because Ms. Selenke failed to offer evidence that those reasons were pretextual, there is no indication that MIC violated Colorado public policy, as read

35

by the <u>Miedema</u> court. Thus, the district court properly granted summary judgment on Ms. Selenke's state law claim.

<u>IV. CONCLUSION</u>

For the reasons set forth above, we AFFIRM the district court's grant of summary judgment to MIC on all of Ms. Selenke's claims.