**Patrick L. MARTIN, Plaintiff,**

v.

**AT&T CORPORATION, a New York corporation, Defendant.**

No. CIV.A.02–N–2376.

United States District Court, D. Colorado.

Aug. 3, 2004.

William J. Martinez, McNamara & Martinez, LLP, Andrea E. Faley, Law Office

of Andrea E. Faley, LLC, Denver, CO, for Plaintiff.

Paul Justin McCue, Sherman & Howard, Denver, CO, for Defendant.

## ORDER AND MEMORANDUM OF DECISION

NOTTINGHAM, District Judge.

This is an Americans with Disabilities Act ("ADA") and Age Discrimination in Employment Act ("ADEA") case. Plaintiff Patrick Martin alleges that Defendant AT & T Corporation discriminated against him because of his age, disabilities, and request for an accommodation for his disabilities. This matter is before the court on "Defendant AT & T's Motion for Summary Judgment," filed August 20, 2003, and "Plaintiff's Motion to Strike Portions of Defendant's Summary Judgment Reply Brief," filed November 25, 2003. Jurisdiction is based upon 28 U.S.C.A. § 1331 (West 1993 & Supp.2003).

## FACTS

### 1. Factual Background

Plaintiff worked for defendant from August 1998 until March 18, 2002. (Def.'s Br. in Supp. of Mot. for Summ. J., Statement of Undisputed Facts ¶ 1 [filed Aug. 20, 2003] [hereinafter "Def.'s Br."]; *admitted at* Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J., Resp. to Statement of Undisputed Facts ¶ 1 [filed Sept. 23, 2003] [hereinafter "Pl.'s Resp."].) Plaintiff was one of two B–Band level managers working under Raymond Urban, in defendant's Local Network Services division. (Def.'s Br., Statement of Undisputed Facts ¶¶ 2–3, 14; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 2–3, 14.) Defendant classifies its managers by level, with A–Band level managers as the lowest level managers. The other B–Band level manager under Urban was Edward Ball. (*Id.*, Statement of Undisputed Facts ¶ 14; *admitted at* Pl.'s Resp., Resp. to State-

ment of Undisputed Facts ¶ 14.) Urban's boss was William Riggan, although Lori Whidden replaced Riggan in January 2002. (*Id.*, Statement of Undisputed Facts ¶¶ 6–7; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 6–7.)

### a. Plaintiff's 1999 Request for a Medical Accommodation

During his service in Vietnam, plaintiff was exposed to Agent Orange. (Pl.'s Resp., Statement of Additional Facts, Introductory or Jurisdictional Matters ¶¶ 1–2; *admitted at* Def.'s Reply Br. in Supp. of Mot. for Summ. J., Reply to Additional Facts, Introductory or Jurisdictional Matters ¶¶ 1–2 [filed Oct. 28, 2003] [hereinafter "Def.'s Reply"].) In 1995, plaintiff underwent surgery for prostate cancer, probably caused by Agent Orange. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 1; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 1.) In early 1999, after a recurrence of prostate cancer, plaintiff underwent radiation therapy which impaired his urinary control mechanism. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 1; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 1.) As a result, he began suffering from increased urinary frequency and urgency. (*Id.*) This is a typical side-effect of radiation therapy and often continues after the therapy has been concluded. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 2; *admitted at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 2.) The cancer treatment also caused plaintiff to suffer from fatigue. (Def.'s Br., Statement of Undisputed Facts ¶ 57; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 57.)

In light of these medical issues plaintiff self-identified himself, in early 1999, as a disabled employee on defendant's intranet network. (Pl.'s Resp., Statement of Additional Facts, Regarding ADA Claims ¶ 3; *admitted at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 3.) In 1999, plaintiff discussed his cancer with Urban, who was himself a cancer survivor. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 4; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 4.) In December 1999, plaintiff requested a medical accommodation for fatigue caused by radiation treatment he was receiving. (Def.'s Br., Statement of Undisputed Facts ¶ 55; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 55.)

Defendant's policy states that it will supply reasonable accommodation "to an employee whose need for an accommodation is medically supported if that accommodation will not cause an undue hardship to the business and will enable the individual to perform the essential functions of his or her position." (*Id.*, Statement of Undisputed Facts ¶ 52; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 52.) Defendant's policy provides that if an employee needs a job accommodation, then he should request such an accommodation either from his supervisor or from human resources. (*Id.*, Statement of Undisputed Facts ¶ 51; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 51.) Defendant's health services organization within human resources then determines whether the request for accommodation is substantiated and necessary. (*Id.*, Statement of Undisputed Facts ¶ 54; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 54.) If "the reason for accommodation and disability are not obvious," the employee is required to submit "medical documentation." (*Id.*, Statement of Undisputed Facts ¶ 53; *denied at* Pl.'s Resp., Resp.

to Statement of Undisputed Facts ¶ 53; Pl.'s Resp., Ex. 12 at AT & T 730 [Def.'s Job Accommodations: Employee Responsibilities].)

Per the request of Patricia Woldman, R.N., who worked in defendant's human resources health services organization, plaintiff's physician, David Shimm, M.D., submitted a form stating that plaintiff "may work from home" for a six month period of time due to his fatigue. (*Id.*, Statement of Undisputed Facts ¶ 57; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 57.) Defendant has two methods of allowing some of its employees to work at home. The first method is called a virtual office ("VO"), which is a full-time assignment working from home. (*Id.*, Statement of Undisputed Facts ¶ 50; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 50.) The second method is called telecommuting, where the employee works part of the time at his home and part of the time in the office. (*Id.*)

Plaintiff's manager did not object to Dr. Shimm's recommendation for a VO. (*Id.*, Statement of Undisputed Facts ¶ 58; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 58.) Thus, defendant's health affairs organization approved plaintiff to work VO beginning in December 1999. (*Id.*, Statement of Undisputed Facts ¶ 59; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 59.) According to defendant, it approved the VO for six months as suggested in Dr. Shimm's medical form. (*Id.*, Statement of Undisputed Facts ¶ 59; *denied in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 59.) According to plaintiff, defendant did not inform him that his request was only granted for six months, and defendant did not require plaintiff to renew his re-

quest for accommodations after the six month period passed. (*Id.*)

### b. Plaintiff's Continued Medical Problems in 2001

In 2001, plaintiff continued to struggle with the after effects of his radiation treatment. In September of 2001, plaintiff needed to get up twice a night to urinate. (Pl.'s Resp., Statement of Additional Facts, Regarding ADA Claims ¶ 1; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 1.) By July 2002, several months after defendant had terminated plaintiff's employment, plaintiff needed to get up as often as six or seven times a night. (*Id.*) Due to, among other things, his need to go to the bathroom, plaintiff testified that he was getting at most four hours of sleep a night during the fall of 2001. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 35; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 35.) In addition to his sleep at night, plaintiff got some time to lie down/nap during the day in 2001. (Def.'s Br., Ex. A–6 at 3 [Pl.'s Answers to Def.'s Second Set of Interrogs.].)

When plaintiff was at defendant's office in 2001—in compliance with Urban's requirement that plaintiff be in the office during much of 2001, as discussed below—plaintiff never wet his undergarments because he always either (1) made it to the bathroom in time, or (2) wore protection. (*Id.*, Statement of Undisputed Facts ¶ 81; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 81.) As a general matter, plaintiff testified at his deposition that his fatigue and incontinence did not cause him job performance problems, but that he was exhausted at work. (*Id.*, Statement of Undisputed Facts ¶ 80; *denied at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 80; Def.'s Br., Ex. Pl.'s Dep. at 143, 456

[Plaintiff's Dep.].) Specifically, plaintiff testified as follows at his deposition.

Q: How was the fatigue affecting you at work from when the VO stopped in February [2001] up until the middle of 2001?

A: I would kind of be like a zombie. It's—you're kind of in a daze, you're not here, sometimes you're not there. It's—it's kind of strange—you don't have eight hours' sleep, six hours' sleep, I don't—just I—I don't know what word I could use for it. It's just you're—you're in a strange situation. Fatigued, wore out, no energy.

Q: Did it cause you performance problems?

A: Not that I'm aware of. . . .

Q: Mr. Martin, you just testified that your incontinence and post-traumatic stress syndrome caused you to be at times exhausted and fatigued; is that correct?

A: That is correct.

Q: And do you believe that ever led to performance problems when you were working [for defendant] in 2001?

A: I don't think so.

(*Id.*, Ex. Pl.'s Dep. at 143, 456 [Plaintiff's Dep.].)

### c. The Formation of the NPC and Plaintiff's 2001 Accommodations

Despite the fact that plaintiff had only been approved to work VO for six months, he continued to work VO without defendant objecting through early 2001. (*Id.*, Statement of Undisputed Facts ¶ 60; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 60.) Plaintiff's team, like plaintiff, worked primarily from their homes. (*Id.*)

In 2001, defendant formed the Broadband Network Performance Center ("NPC") to focus on the specific network

traffic and capacity needs of a large subsidiary of defendant, AT & T Broadband. (*Id.*, Statement of Undisputed Facts ¶ 5; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 5.) The NPC's role included network augment requests from AT & T Broadband that plaintiff's division had not previously performed. (*Id.*)

On February 10, 2001, Urban held a meeting with his team where he informed them that (1) their unit would be disbanded and (2) defendant was forming the NPC to focus on project management for AT & T Broadband. (*Id.*, Statement of Undisputed Facts ¶¶ 61–62; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 61–62.) Urban told plaintiff and his team that they could not work VO in their new NPC positions. (*Id.*, Statement of Undisputed Facts ¶¶ 63, 65; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 63, 65.) At this meeting, plaintiff told Urban that he had been working VO for medical reasons, but did not elaborate on these reasons. (Pl.'s Resp., Statement of Additional Facts, Regarding ADA Claims ¶ 6; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 6.)

Urban explained that he would permit a transitional period from mid-April 2001 to January 2002, where the team could bridge the gap between working VO and working entirely from the office, by telecommuting. (Def.'s Br., Statement of Undisputed Facts ¶ 64; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 64.) Despite Urban's insistence that the team telecommute during this period, one member of the team, Jim West, an independent contractor, worked from home. (Pl.'s Resp., Statement of Additional Facts, Regarding ADA Claims ¶ 8; *admitted in relevant part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 8.)

West, however, did not live in the same state as the rest of the NPC team, and stopped working for defendant in November 2001. (*Id.*) At this meeting, moreover, Urban gave the team time to decide whether they wanted to give up their VOs and stay with the NPC, or if they wanted to pursue a position elsewhere in the company. (Def.'s Br., Statement of Undisputed Facts ¶ 65; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 65.)

In April 2001, Urban and plaintiff discussed plaintiff's ability to perform the work at the office and, according to Urban, plaintiff stated that he could work at the office. (Pl.'s Resp., Statement of Additional Facts, Regarding ADA Claims ¶ 4; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 4; Pl.'s Resp., Ex. 17 [electronic mail message from Urban to plaintiff on 1/1/02].) However, according to plaintiff, he repeatedly asked Urban, from February until December of 2001, to approve the reinstatement of his VO position. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 10; *denied at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 10.) According to plaintiff, and disputed by defendant, plaintiff explained to Urban that he needed the VO because of his incontinence and fatigue that resulted from his cancer treatments. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 11; *denied at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 11.)

According to plaintiff, in June 2001 and then again later in 2001, he brought up the VO issue with Riggan. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 13; *denied in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 13.) According to plaintiff, Riggan said that he was not going to

get involved and that he needed plaintiff in the NPC. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 14; *denied in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 14.) Plaintiff claims that during this period he failed to contact Health Affairs because he wanted to work with his supervisors on this dispute and not go over their heads prematurely. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 17; *admitted in part, denied in part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 17.)

During 2001, plaintiff worked approximately thirty to thirty-five percent of the time from home, although much of this time was on the weekends, evenings, and early mornings. (Def.'s Br., Statement of Undisputed Facts ¶¶ 67–69; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 67–69.) Of the time plaintiff allocated to working at home, he spent approximately twenty percent of the time napping or resting lying down. (*Id.*, Statement of Undisputed Facts ¶ 67; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 67.)

During this time, plaintiff managed a team of five people, Fred Aragon, Thomas Fiddes, Dean Hornbacher, Curtis Gotchall, and West. (*Id.*, Statement of Undisputed Facts ¶ 43; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 43; Pl.'s Resp., Statement of Additional Facts, Introductory or Jurisdictional Matters ¶ 3; *admitted at* Def.'s Reply, Reply to Additional Facts, Introductory or Jurisdictional Matters ¶ 3.) Two of them, Gotchall and West, were independent contractors. (Pl.'s Resp., Statement of Additional Facts, Introductory or Jurisdictional Matters ¶ 3; *admitted at* Def.'s Reply, Reply to Additional Facts, Introductory or Jurisdictional Matters ¶ 3.) Gotchall was plaintiff's son-in-law. (Def.'s Br., Statement of Undis-

puted Facts ¶ 24; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 24.)

### d. Plaintiff's 2002 Request for a VO and the 2002 Criticism of his Performance

On January 1, 2002, plaintiff requested a VO from Urban due to his incontinence problems, explaining that he was having health problems regarding his cancer treatment. (*Id.*, Statement of Undisputed Facts ¶ 73; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 73; Pl.'s Resp., Statement of Additional Facts, Regarding ADA Claims ¶ 4; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 4.) In response, Urban informed plaintiff that the NPC management team was not expected to be VO, and that they would work with Human Resources regarding his medical condition. (*Id.*, Statement of Undisputed Facts ¶ 73; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 73.)

Then, on January 2, 2002, plaintiff requested to work VO from Woldman in defendant's health affairs office. (*Id.*, Statement of Undisputed Facts ¶ 74; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 74.) Urban was aware of plaintiff's request to Woldman. (Pl.'s Resp., Statement of Additional Facts, Regarding ADA Claims ¶ 19; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 19.) According to plaintiff, he needed to work VO because it (1) permitted him to take frequent breaks and naps, and (2) prevented the embarrassment of frequent bathroom usage. (Def.'s Br., Statement of Undisputed Facts ¶ 75; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 75.) Plaintiff also believed that working VO was more

appropriate for business reasons because he believed he could be more efficient at home due to the distractions and inadequate equipment at the office. (*Id.*, Statement of Undisputed Facts ¶ 76; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 76.)

One day later, on January 3, 2002, Urban gave plaintiff a counseling memorandum outlining plaintiff's numerous alleged deficiencies and requesting that plaintiff take specific steps to show improvement. (Pl.'s Resp., Statement of Additional Facts, Regarding ADA Claims ¶ 19; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 19; Pl.'s Resp., Ex. 4 [Letter of Counsel].) Plaintiff had never been officially reprimanded for these deficiencies, or any other deficiencies, prior to this memorandum. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶¶ 21–23; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶¶ 21–23.) The parties dispute whether Urban attached a formal Performance Improvement Plan ("PIP") to this January 3, 2002 memorandum. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 19; *denied in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 19.)[1] If defendant placed plaintiff on a PIP on January 3, 2002, it did not follow its internal procedures for doing so. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 20; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 20.)

From the date of Urban's January 3, 2002 memorandum onwards, Urban kept daily track of plaintiff's alleged work deficiencies and lack of time working. (*Id.*,

Statement of Additional Facts, Regarding ADA Claims ¶ 24; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 24; Pl.'s Resp., Ex. 23 [Documentation of Counsel].) On January 9, 2002, Urban issued plaintiff his performance appraisal, which documented nearly the identical level of performance as the previous year, but dropped plaintiff's numerical ratings from above average to average. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 25; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 25.) This performance review did not include any of the alleged deficiencies identified by Urban in the January 3, 2002 counseling memorandum. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶¶ 21–23; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶¶ 21–23.)

### e. The Force Management Program

In the latter part of 2001, during the formation of the NPC, as discussed above, defendant's division managers, directors, and vice-presidents began planning for a nationwide reduction in force ("RIF"), called a force management program ("FMP"). (Def.'s Br., Statement of Undisputed Facts ¶¶ 1, 4; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 1, 4.) Riggan had been the manager ultimately in charge of the NPC, but since defendant was replacing him with Whidden in January 2002, defendant gave Whidden the responsibility to make the FMP decisions for the NPC. (*Id.*, Statement of Undisputed Facts ¶¶ 6–7; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 6–7.)

---

**1.** Defendant, in its letter to the Equal Employment Opportunity Commission, averred that it placed plaintiff on a PIP on January 3, 2002. (Pl.'s Resp., Ex. 3 at Martin 0004 n. 4 [EEOC letter].) This averment contradicts defendant's current position that it did not place plaintiff on a PIP on January 3, 2002.

In December 2001, defendant director Rick Williams instructed Whidden to reduce her NPC headcount for the March 2002 FMP by one A–Band level manager and one B–Band level manager. (*Id.,* Statement of Undisputed Facts ¶ 8; *admitted in part, denied in part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 8; *see also* Pl.'s Reply, Reply to Statement of Undisputed Facts ¶ 8.)

Whidden made her determination as to who would be terminated from the NPC based upon her assessment of the skills needed in the NPC. (*Id.,* Statement of Undisputed Facts ¶ 11; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 11.) Specifically, she believed that the NPC would focus on project management. (*Id.*) Urban provided Whidden with information on his team that Whidden used in making her decisions on the layoffs. (*Id.,* Statement of Undisputed Facts ¶ 11; *admitted in part, denied in part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 11.) The parties dispute whether Whidden herself was in a position to know the skills of the people in the NPC group. (*Id.,* Statement of Undisputed Facts ¶ 11; *denied in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 11; *admitted and denied at* Def.'s Reply, Reply to Statement of Undisputed Facts ¶ 11.)

Whidden placed plaintiff and Ball, the other B–Band manager under Urban, in different universes. (Pl.'s Resp., Statement of Additional Facts, Regarding ADEA Claims ¶ 3; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 3.) A universe is the term in defendant's organization for a particular employee's job function within the organization. According to plaintiff, and disputed by defendant, Whidden was supposed to consider the plaintiff's "[l]evel, transferable skills, and sometimes location," in determining his universe. (*Id.,* Statement of Additional Facts, Regarding ADEA Claims ¶ 2; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 2; Pl.'s Resp., Ex. 1 at AT & T 918 (Draft Universe Definition).)

Of the two B–Band level managers, Whidden chose to retain Ball and designate plaintiff "at risk" for the FMP. (Def.'s Br., Statement of Undisputed Facts ¶ 13; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 13.) The parties vigorously dispute whether Whidden made her decision that plaintiff should be at risk for the FMP in late December 2001 or January 2002. (*Id.,* Statement of Undisputed Facts ¶ 9; *denied in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 9.)

Whidden made this choice because she believed that Ball was a better candidate for the one remaining B–Band level position. (*Id.,* Statement of Undisputed Facts ¶ 13; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 13.) In reaching her decision, Whidden considered, among other factors, the fact that Ball had greater B–Band management experience than the plaintiff. (*Id.,* Statement of Undisputed Facts ¶ 16; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 16.) Whidden believed that Ball had greater training, knowledge, skills, and client relations than plaintiff in technical and managerial areas. (*Id.,* Statement of Undisputed Facts ¶¶ 17–18, 20, 28; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 17–18, 20, 28.) The parties dispute whether Whidden's belief was premised upon full knowledge and accurate information from Urban. (*Id.,* Statement of Undisputed Facts ¶¶ 17–18, 28; *denied in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 17–18, 28.) Whidden also considered

the fact that Ball had a stronger college background than plaintiff. (*Id.*, Statement of Undisputed Facts ¶¶ 29–30; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 29–30.) Whidden also believed that Ball had excellent client relation skills. (*Id.*, Statement of Undisputed Facts ¶ 19; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 19.) Whidden's assessment of Ball's client relation skills was premised, at least in part, upon the information Urban provided to her, and the parties dispute the accuracy of Urban's assessment of plaintiff and Ball's abilities to deal with clients. (Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 19; *admitted in part, denied in part at* Def.'s Reply, Reply to Statement of Undisputed Facts ¶ 19.) Whidden also believed plaintiff exhibited poor judgment as a manager when he hired his son, Patrick A. Martin, and his son-in-law Gotchall, to fill two contractor positions on his team. (Def.'s Br., Statement of Undisputed Facts ¶ 24; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 24.)

Whidden, moreover, rested her decision, in part, upon the comparative performance ratings of plaintiff and Ball. (Pl.'s Resp., Statement of Additional Facts, Regarding ADEA Claims ¶ 12; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 12.) According to defendant's EEO officer, however, defendant does not consider the point value average from performance reviews when a person, such as plaintiff, is laid off because his function is eliminated. (*Id.*, Statement of Additional Facts, Regarding ADEA Claims ¶ 19; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 19.) In 2000, plaintiff had a performance rating of one and Ball had a performance rating of five. (Def.'s Br., Statement of Undisputed Facts ¶ 21; *admitted in pertinent part at* Pl.'s Resp.,

Resp. to Statement of Undisputed Facts ¶ 21; Pl.'s Resp., Statement of Additional Facts, Regarding ADEA Claims ¶¶ 17–18; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶¶ 17–18.) Under defendant's evaluation methods, a lower score meant the employee performed better than a higher score. (*Id.*) In 2001, Urban lowered plaintiff's performance rating to five while he raised Ball's performance rating to one. (*Id.*) As discussed above, although Urban lowered plaintiff's 2001 performance rating, his comments regarding plaintiff's work, in each category, was, for all intents and purposes, identical to his 2000 comments. (Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 21; *admitted in relevant part at* Def.'s Reply, Reply to Resp. to Statement of Undisputed Facts ¶ 21.)

Defendant's organizational chart regarding the various employees' performance ratings contained a clerical error that incorrectly identified plaintiff's average performance rating of 2001 and 2002 ratings. (*Id.*, Statement of Additional Facts, Regarding ADEA Claims ¶ 17; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 17.) This chart did not show Ball, even though the chart contained information on some other retained employees. (*Id.*, Statement of Additional Facts, Regarding ADEA Claims ¶ 18; *admitted in part, denied in part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 18.)

Also of note, Gotchall was not placed at risk for the FMP. Gotchall worked for defendant as an independent contractor from March 2001 to May 2003 through a temporary agency. (Def.'s Br., Statement of Undisputed Facts ¶ 35; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 35.) Defendant's unwritten policy required defendant to prefer em-

ployees over independent contractors when deciding who to retain during a reduction in force. (Pl.'s Resp., Statement of Additional Facts, Regarding ADEA Claims ¶¶ 7–8; *admitted in pertinent* part at Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶¶ 7–8.)

Gotchall was not a manager and did not have anyone reporting to him. (Def.'s Br., Statement of Undisputed Facts ¶ 36; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 36.) However, defendant treated Gotchall, in many ways, like a manager. (Pl.'s Resp., Statement of Additional Facts, Regarding ADEA Claims ¶ 1; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 1.) Gotchall attended B–Band level manager meetings, reported to Urban, and viewed himself as plaintiff's peer. (*Id.*)

According to Whidden, she was not aware of plaintiff's age and did not consider it a factor in her determination. (Def.'s Br., Statement of Undisputed Facts ¶ 44; *denied at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 44.) Plaintiff, on the other hand, contends that he was noticeably older than most of the other NPC technical employees, and Whidden must have been aware of this fact. (*Id.*) The parties agree that Whidden was unaware of both plaintiff's disabilities and his requests to have VO accommodations. (*Id.,* Statement of Undisputed Facts ¶¶ 45–46; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 45–46.)

### f. Morgan and Thompson

In December 2001 or January 2002, Justin Thompson and Chris Morgan transferred to the NPC from AT & T Broadband. (*Id.,* Statement of Undisputed Facts ¶ 32; *admitted in pertinent part at*

Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 32.) Defendant extended offers to these two individuals in early November 2001. (Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 16.) Thompson was twenty-six years old and Morgan was thirty-three years old at the time. (Pl.'s Resp., Statement of Additional Facts, Introductory or Jurisdictional Matters ¶ 9; *admitted at* Def.'s Reply, Reply to Additional Facts, Introductory or Jurisdictional Matters ¶ 9.) Both Thompson and Morgan had knowledge of the configuration and architecture of the MediaOne 5E switches, of which defendant had a dozen. (Def.'s Br., Statement of Undisputed Facts ¶ 31–32; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 31–32.) Plaintiff did not have the requisite knowledge regarding these switches. (*Id.,* Statement of Undisputed Facts ¶ 34; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 34.) The parties dispute whether plaintiff could have easily learned how to operate these switches, and how competently plaintiff could do so once he learned. (*Id.,* Statement of Undisputed Facts ¶ 34; *denied in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 34.)

Whidden chose to transfer Thompson and Morgan prior to the implementation of the FMP, although plaintiff contends that Whidden was already planning on replacing plaintiff with Thompson and Morgan when she decided to transfer them. (*Id.,* Statement of Undisputed Facts ¶ 33; *admitted in part, denied in part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 33; Pl.'s Resp., Statement of Additional Facts, Regarding ADEA Claims ¶ 16; *denied in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 16.)[2] Plaintiff raises

---

2. This averment is strange because otherwise plaintiff argues that Whidden made her decision to terminate plaintiff in January of 2002,

the issue of the method by which Thompson and Morgan were transferred. Defendant's policy requires that management job openings be advertised in the employee job net for at least five business days. (Pl.'s Resp., Statement of Additional Facts, Regarding ADEA Claims ¶ 15; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 15.) According to Ball and Urban's recollection, they think that this posting did not occur, and there were no interviews for Morgan and Thompson's positions. (See Pl.'s Filing of Omitted Dep. Pages [filed June 9, 2004].) Defendant's policy, however, has an exception for lateral candidates. (Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 15; Pl.'s Resp., Ex. 26 at AT & T 975.)

### g. Plaintiff's Termination

■ Defendant designated plaintiff as at risk for the FMP on January 18, 2002. (Pl.'s Resp., Statement of Additional Facts, Introductory or Jurisdictional Matters ¶ 4; *admitted at* Def.'s Reply, Reply to Additional Facts, Introductory or Jurisdictional Matters ¶ 4.) On January 20 or 21, 2002, Urban left a voice message for plaintiff saying that the reasons plaintiff was at risk for the FMP was the work he was performing with the NPC was not related to AT & T Broadband. (*Id.,* Statement of Additional Facts, Regarding ADA Claims ¶ 32; *denied at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 32.)[3] The parties dispute whether plaintiff's work was indeed unrelated to AT & T Broadband, and Urban told defendant's

EEO officer that plaintiff's work was related to AT & T Broadband. (*Id.*)

After plaintiff was designated at risk for the FMP, he was released from his regular work duties to search over the next sixty days for a new position within defendant company. (Def.'s Br., Statement of Undisputed Facts ¶ 10; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 10; Pl.'s Resp., Statement of Additional Facts, Introductory or Jurisdictional Matters ¶ 4; *admitted at* Def.'s Reply, Reply to Additional Facts, Introductory or Jurisdictional Matters ¶ 4.) For the sixty day period after being placed at risk for the FMP, defendant was unable to obtain another position. (*Id.,* Statement of Undisputed Facts ¶ 10; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 10.)

Defendant had a policy that when an employee is placed at risk for layoffs, he may apply and be considered for positions at a lower band level and retain his higher salary for one year. (Pl.'s Resp., Statement of Additional Facts, Regarding ADEA Claims ¶ 20; *admitted at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 20.) Since March 2002, defendant transferred six A–Band positions into the NPC. (*Id.*) According to plaintiff, however, he was never asked if he was interested in applying for any of these positions. (*Id.,* Statement of Additional Facts, Regarding ADEA Claims ¶ 21; *denied in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 21.)[4]

---

while defendant contends that Whidden made this decision much earlier.

3. Defendant denies this averment on the ground that it is hearsay. (Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 32.) While courts will not rely upon inadmissible evidence in ruling on a motion for summary judgment, *Nobody in Particular*

*Presents, Inc. v. Clear Channel Communications, Inc.,* 311 F.Supp.2d 1048, 1094–95 (D.Colo.2004), this statement appears, at first glance, to fall within the party-opponent exception, and defendant has provided no reason why it does not fall within this exception.

4. Plaintiff does not cite to the record to support this averment.

Defendant terminated plaintiff's employment on March 18, 2002. (Def.'s Br., Statement of Undisputed Facts ¶¶ 1, 10; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 1, 10; Pl.'s Resp., Statement of Additional Facts, Introductory or Jurisdictional Matters ¶ 5; *admitted at* Def.'s Reply, Reply to Additional Facts, Introductory or Jurisdictional Matters ¶ 5.) At the time of his termination, plaintiff was fifty-one years old. (*Id.*, Statement of Undisputed Facts ¶ 40; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 40.) Ball, at the time, was thirty years old. (Pl.'s Resp., Statement of Additional Facts, Introductory or Jurisdictional Matters ¶ 8; *admitted at* Def.'s Reply, Reply to Additional Facts, Introductory or Jurisdictional Matters ¶ 8.)

According to defendant, after it terminated plaintiff, Gotchall, Ball, Urban, Hornbacher, and Fiddes assumed plaintiff's former responsibilities. (Def.'s Br., Statement of Undisputed Facts ¶ 38; *denied at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 38.) According to plaintiff, virtually all of his job responsibilities were assumed by Gotchall. (*Id.*) The only other relevant event after defendant terminated plaintiff's employment was that plaintiff's doctors diagnosed plaintiff with Post Traumatic Stress Disorder from his service in Vietnam. (Pl.'s Resp., Statement of Additional Facts, Regarding ADA Claims ¶ 82; *admitted at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 35.)

## 2. Procedural History

On June 13, 2002, plaintiff filed his charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Am. Compl. ¶ 9; *admitted at* Answer of Def. AT & T Corp. to Pl.'s Am. Compl. and Jury Demand ¶ 9 [filed Feb. 12, 2003] [hereinafter "Answer"].) The EEOC issued plaintiff a notice of a right to sue on September 24, 2002. (*Id.* ¶ 10; *admitted at* Answer ¶ 10.) On December 20, 2002, plaintiff filed his complaint in this court. (Compl. and Jury Demand [filed Dec. 20, 2002].) Plaintiff filed an amended complaint on January 17, 2003. (Am. Compl.)

Plaintiff's amended complaint set forth five claims for relief, (1) age discrimination in violation of the ADEA, (2) disability discrimination in violation of the ADA, (3) retaliation in violation of the ADA, (4) interference with ADA rights, and (5) discharge in violation of ERISA. (Am. Compl. ¶¶ 75–113.) Plaintiff subsequently agreed to drop his fifth claim for relief. (Preliminary Pretrial Order at 6 [filed Aug. 12, 2003].)

On August 20, 2003, defendant moved for summary judgment on plaintiff's four remaining claims for relief. (Def. AT & T's Mot. for Summ. J. [filed Aug. 20, 2003].) After the parties fully briefed this motion, plaintiff moved to strike portions of defendant's summary judgment reply brief. (Pl.'s Mot. to Strike Portions of Def.'s Summ. J. Reply Br. [filed Nov. 25, 2003] [hereinafter "Pl.'s Mot. to Strike"].)

## ANALYSIS

### 1. Standard of Review

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the ... moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c) (2003); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986); *Concrete Works, Inc. v. Denver, City & County,* 36 F.3d 1513, 1517 (10th Cir.1994).

The moving party bears the initial burden of showing an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). "Once the moving party meets this burden, the burden shifts to the nonmoving party to demonstrate a genuine issue for trial on a material matter." *Concrete Works, Inc.,* 36 F.3d at 1518 (citing *Celotex Corp.,* 477 U.S. at 325, 106 S.Ct. at 2554). The nonmoving party may not rest solely on the allegations in the pleadings, but must instead designate "specific facts showing that there is a genuine issue for trial." *Celotex Corp.,* 477 U.S. at 324, 106 S.Ct. at 2553; *see* Fed.R.Civ.P. 56(e). " 'Only disputes over facts that might affect the outcome of the suit under governing law will preclude the entry of summary judgment.' " *Sanchez v. Denver Pub. Schs.,* 164 F.3d 527, 531 (10th Cir.1998) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2505). The court may consider only admissible evidence when ruling on a summary judgment motion. *See World of Sleep, Inc. v. La–Z–Boy Chair Co.,* 756 F.2d 1467, 1474 (10th Cir.1985). The factual record must be viewed in the light most favorable to the nonmoving party. *Concrete Works, Inc.,* 36 F.3d at 1518 (citing *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 [10th Cir.1990] ).

### 2. Plaintiff's ADEA Claim

■ Defendant argues that plaintiff's first claim for relief, age discrimination in violation of the ADEA, cannot survive summary judgment. (Def.'s Br. at 14–21.) The ADEA provides that it is "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C.A. § 623(a)(1) (West 1999 & Supp.2003). In ADEA cases, "the plaintiff's age must have 'actually played a role in [the employer's decisionmaking] process and had a determinative influence on the outcome.' " *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 141, 120 S.Ct. 2097, 2105, 147 L.Ed.2d 105 (2000) (alteration in original) (quoting *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701 [1993] ).

■ In evaluating plaintiff's ADEA claim, I must apply a three-stage analysis. *McKnight v. Kimberly Clark Corp.,* 149 F.3d 1125, 1128 (10th Cir.1998). "At the first stage, the plaintiff must prove a *prima facie* case of discrimination." *Id.* If the plaintiff does so, at the second stage, the defendant must provide "a legitimate nondiscriminatory reason for plaintiff's termination." *Id.* If the defendant provides such a reason, "[i]n the third stage, plaintiff must show that age was a determinative factor in defendant's employment decision, or show that the defendant's explanation was merely a pretext." *Id.* I will address each stage, in turn.

#### a. Stage One: Plaintiff's Prima Facie Case

■ In order to establish a *prima facie* case of discriminatory discharge under the ADEA in a RIF case, plaintiff "must prove: (1) that [ ]he is within the protected age group; (2) that [ ]he was doing satisfactory work; (3) that [ ]he was discharged despite the adequacy of h[is] work; and (4) that there is some evidence the employer intended to discriminate against h[im] in reaching its RIF decision." *Beaird v. Seagate Tech., Inc.,* 145 F.3d 1159, 1165 (10th Cir.1998). Defendant asserts that plaintiff cannot meet the fourth prong of his *prima facie* case. (Def.'s Br. at 15.) Elaborating on the fourth prong, the Tenth Circuit has explained that the plaintiff must

> point to circumstances that show that the employer could have retained h[im], but chose instead to retain a younger employee. . . . Even though certain exi-

gencies of RIF cases may explain the employer's action in such circumstances, these exigencies are best analyzed at the stage where the employer puts on evidence of a nondiscriminatory reason for the discharge.

*Beaird,* 145 F.3d at 1167 (internal quotation marks omitted).

Here, plaintiff has pointed to circumstances that show that defendant could have retained him, but chose instead to retain a younger employee, Ball. That is all that plaintiff is required to show to meet the fourth prong of his *prima facie* case. *Beaird,* 145 F.3d at 1167.

Defendant, however, argues that Ball is not comparable to plaintiff because Whidden believed that Ball had the better skills for the lone B–Band level position that would remain in the NPC. (Def.'s Br. at 16–17.) These better skills, according to defendant, included Ball's greater management experience, knowledge of the more commonly used switches, excellent client relation skills, his higher performance rating in 2001, and better judgment than plaintiff because plaintiff hired his own family members. (*Id.*) These arguments, however, are nondiscriminatory reasons for the discharge. *See Beaird,* 145 F.3d at 1167. Both Ball and plaintiff must have been viable candidates for the remaining position. Otherwise there would have been no reason for Whidden to compare the quality of their work. Since Whidden could have retained plaintiff, but chose to retain Ball, plaintiff has met his *prima facie* burden.

### b. Stage Two: Defendant's Showing of Legitimate Nondiscriminatory Reason

■■■ If plaintiff establishes a *prima facie* case, "the defendant must carry the burden to provide a legitimate nondiscriminatory reason for plaintiff's termination."

*McKnight,* 149 F.3d at 1128; *Greene,* 98 F.3d at 558. Defendant's burden is

> merely to articulate through some proof a facially nondiscriminatory reason for the termination; the defendant does not at this stage of the proceedings need to litigate the merits of the reasoning, nor does it need to prove that the reason relied upon was bona fide, nor does it need to prove that the reasoning was applied in a nondiscriminatory fashion. However, the proffered reason for the action taken against the minority employee must be reasonably specific and clear.

*E.E.O.C. v. Flasher Co., Inc.,* 986 F.2d 1312, 1316 (10th Cir.1992) (citations and footnote omitted); *see also Sims v. Halliburton Co.,* 185 F.3d 875, 1999 WL 495629, at *11 (10th Cir.1999) (table) (applying this rule to a summary judgment motion in an ADEA case); *Jacobs v. Delta Air Lines, Inc.,* 156 F.3d 1243, 1998 WL 514620, at *3 n. 2 (10th Cir.1998) (table) (same). For the reasons set forth in the previous section, defendant has more than met this burden.

### c. Stage Three: Plaintiff's Showing Discriminatory Motive or Pretext

■■ If the defendant meets its burden at the second stage of showing a "legitimate nondiscriminatory reason for plaintiff's termination," plaintiff can still prevail if he can show "pretext." *McKnight,* 149 F.3d at 1128. "Pretext can be shown by such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Danville v. Regional Lab Corp.,* 292 F.3d 1246, 1250 (10th Cir.2002) (quoting *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323

[10th Cir.1997].) Plaintiff argues he has demonstrated pretext by showing defendant's (1) procedural irregularities, (2) inconsistencies and shifting rationales, and (3) use of subjective criteria. (Pl.'s Resp. at 40–54.) I address each of these arguments in turn.

### 1. Defendant's Alleged Procedural Irregularities

] Plaintiff argues that defendant's alleged failures to follow its own policies and procedures demonstrates pretext. (Pl.'s Resp. at 41–46.) "[D]isturbing procedural irregularities, including deviations from normal company procedure, provide support for a plaintiff's assertion of pretext." *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n. 11 (10th Cir. 2003) (internal quotation marks omitted). Plaintiff's argument is premised upon four alleged procedural irregularities, which I address in turn.

First, plaintiff argues that defendant failed to follow its own procedure for implementing its FMP. (Pl.'s Resp. at 41–43.) Part of this argument is premised upon the fact that Whidden placed plaintiff and Ball in different universes (job description titles) even though (1) they did roughly the same work, and (2) her instructions were to eliminate one of the two of them. (*Id.*) This action, according to plaintiff, violates defendant's policy because Whidden was required to determine an employee's universe by his "[l]evel, transferable skills, and sometimes location." (*Id.* at 41 [quoting Pl.'s Resp., Ex. 1 at AT & T 918 (Draft Universe Definition) ].) The evidence, taken in a light most favorable to plaintiff, demonstrates that Whidden failed to follow procedures.

The failure to follow procedures does not have a great impact on showing pretext because, as discussed above, Whidden compared and contrasted plaintiff with Ball even though she placed them in different universes. That is not to say, however, that Whidden's grouping has no impact on the issue of pretext. The problem with Whidden's decision to put plaintiff and Ball in different universes is that defendant's EEO officer explained that defendant does not consider the point value average from performance reviews when a person, such as plaintiff, is laid off because their functional universe is eliminated. (*Id.*, Statement of Additional Facts, Regarding ADEA Claims ¶ 19; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 19.) If plaintiff was grouped in the same universe as Ball, Whidden would thus have presumably been required to take this point value average into account. As plaintiff notes, defendant's organizational chart regarding the various employees' performance ratings contained a clerical error that incorrectly identified plaintiff's average performance rating of 2001 and 2002 ratings as worse than they actually were. (*Id.*, Statement of Additional Facts, Regarding ADEA Claims ¶ 17; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 17.) While Whidden did compare and contrast plaintiff and Ball, her failure to put them in the same universe is a procedural irregularity that slightly adds to a showing of pretext.

Second, plaintiff contends that defendant failed to follow its unwritten policy by terminating him before independent contractors, namely Gotchall. (*Id.* at 43–44.) The facts taken in a light most favorable to plaintiff show that Gotchall held a position similar to plaintiff's and took over the vast majority of plaintiff's responsibilities. (Def.'s Br., Statement of Undisputed Facts ¶ 38; *denied at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 38; Pl.'s Resp., Statement of Additional Facts, Regarding ADEA Claims ¶¶ 1, 7–8; *admitted in part, denied in part at* Def.'s Reply,

Reply to Additional Facts, Regarding ADEA Claims ¶¶ 7–8.) While this alleged violation of defendant's unwritten policy is not a strong indicator of pretext, it is one of many factors that suggest pretext.

Third, plaintiff maintains that defendant failed to follow its procedures when it placed plaintiff on a PIP on January 3, 2002. (Pl.'s Resp. at 45.) It is an issue of disputed fact whether Urban placed defendant on a PIP on January 3, 2002. (*Id.,* Statement of Additional Facts, Regarding ADA Claims ¶ 19; *denied in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 19.) If he did, Urban did not follow defendant's internal procedures for doing so. (*Id.,* Statement of Additional Facts, Regarding ADA Claims ¶ 20; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 20.) This helps demonstrate pretext.

Defendant argues, however, that the January 3, 2002 counseling memorandum is irrelevant because Whidden decided to designate plaintiff at-risk for the FMP several weeks prior to the January 3, 2002 memorandum. (Def.'s Reply at 49–50.) The parties, however, dispute whether Whidden made her decision before or after the January 3, 2002 memorandum. (Def.'s Br., Statement of Undisputed Facts ¶ 9; *denied in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 9.) Therefore, defendant's argument cannot prevail at the summary judgment stage.

Fourth, plaintiff asserts that defendant violated its policy by failing to announce a job vacancy prior to bringing in Morgan and Thompson to fill the open positions. (Pl.'s Resp. at 45–46.) Plaintiff's argument as to this point is without merit because defendant's policy provides an exception to the rule that it will announce a job vacancy internally before filling the post in cases where the person filling the post is a later-

al candidate. (*Id.,* Statement of Additional Facts, Regarding ADEA Claims ¶ 15; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 15; Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 15; Pl.'s Resp., Ex. 26 at AT & T 975.) Since Thompson and Morgan were lateral candidates, defendant did not violate its procedures as to this issue. (Def.'s Br., Statement of Undisputed Facts ¶ 32; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 32.)

Three of plaintiff's four arguments regarding defendant's failure to follow its own policies and procedures have some merit. Viewed in their totality, plaintiff's arguments sufficiently demonstrate pretext. I, nevertheless, address plaintiff's other pretext arguments.

### 2. *Defendant's Alleged Inconsistencies, Contradictions, and Shifting Rationales*

Plaintiff argues that defendant's explanations for its decision to terminate plaintiff are replete with inconsistencies, contradictions, and shifting rationales, which demonstrate pretext. (Pl.'s Resp. at 46–52.) As stated above, plaintiff can show pretext through "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons." *Danville,* 292 F.3d at 1250 (10th Cir.2002) (quoting *Morgan,* 108 F.3d at 1323.) Plaintiff sets forth seventeen examples of such alleged inconsistencies, contradictions, and shifting rationales. I address each of these examples in turn.

First, plaintiff argues that defendant's current allegation that Whidden decided to place defendant at risk for the FMP on December 18, 2001 is inconsistent with its previous statements in the case. (Pl.'s Resp. at 47.) In defendant's letter to the

EEOC, although not entirely clear, defendant suggested that its decision to terminate plaintiff occurred between December 31, 2001 and January 7, 2002. (*Id.*, Ex. 3 at Martin 0003–0004 [EEOC letter].) [5] This lone inconsistency is, by itself, not very troubling. It is, however, a small sign of an inconsistency by defendant.

Second, along the same lines as plaintiff's previous argument, plaintiff contends that defendant's averment that Whidden decided to place defendant at risk for the FMP on December 18, 2001 is belied by the fact that Whidden considered plaintiff's alleged performance problems identified in the January 3, 2002 counseling memorandum. (*Id.* at 47.) The facts, taken in a light most favorable to plaintiff, demonstrate that the January 3, 2002 counseling memorandum played a role in Whidden's decision. (Def.'s Br., Statement of Undisputed Facts ¶ 9; *denied in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 9.) Accordingly, like plaintiff's previous argument, this alleged inconsistency is *not very troubling* but is a small sign of pretext for it is an inconsistency in defendant's explanation for its actions.

Third, plaintiff explains that in response to his document request in discovery defendant stated that Whidden only considered one document, plaintiff's performance ratings, in deciding to terminate plaintiff. (*Id.* at 47–48.) This, according to plaintiff, is at odds with defendant's various other assertions that Whidden also considered plaintiff's functionality, technical abilities level, interpersonal skills, etc. (*Id.*) This argument does not demonstrate an inconsistency because Whidden spoke with Urban regarding plaintiff's various alleged problems (Def.'s Br., Statement of Undis-

puted Facts ¶¶ 17–18, 28; *denied in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 17–18, 28) so she would not have needed to review documents regarding these other issues to consider them in reaching her decision.

Fourth, plaintiff maintains that defendant's EEO officer's testimony, that the fact that plaintiff and Ball had an identical average rating was irrelevant because the decision to layoff the plaintiff had not been based on their respective performance ratings, contradicts Whidden's testimony that she considered plaintiff's performance ratings. (Pl.'s Resp. at 48.) This is, at most, a minor inconsistency for it was defendant's EEO officer who said that Whidden would not have taken the performance ratings into account, as opposed to Whidden contradicting herself. (*See id.*, Statement of Additional Facts, Regarding ADEA Claims ¶ 19; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 19.)

Fifth, plaintiff asserts that defendant's explanations of why Whidden decided to place plaintiff at risk for the FMP have been inconsistent because defendant's current argument that Whidden considered plaintiff's alleged deficiencies was not stated in defendant's earlier EEOC letter. (*Id.* at 48.) This argument is without merit because defendant's broad language in the EEOC letter stating that it made its decision "[b]ased upon job performance appraisal ratings, functionality and skill level," includes plaintiff's alleged deficiencies by necessary implication. (*Id.*, Ex. 3 at Martin 0004 [EEOC letter].)

Sixth, plaintiff claims that Urban has been inconsistent in his explanation of the role he played in the FMP. (*Id.* at 48.)

---

**5.** Specifically, in this letter, defendant sets forth a paragraph regarding plaintiff's alleged actions from December 31, 2001 to January 7, 2002, and in the following paragraph explains

that "[i]n the meantime," defendant decided to place plaintiff at risk for the FMP. (Pl.'s Resp., Ex. 3 at Martin 0003–0004 [EEOC letter].)

The facts, taken in a light most favorable to plaintiff, do not show that Urban's position has been inconsistent.

Seventh, plaintiff argues that defendant's letter to the EEOC asserting that there "was no factual basis whatsoever" for plaintiff's assertion that individuals twenty years his junior were hired into the NPC the month he was selected for the layoff contradicts the fact that Morgan and Thompson arrived in the NPC in December 2001 and January 2002. (*Id.* at 48.) This is not much of an inconsistency, because (1) as plaintiff notes, defendant's EEO officer who helped draft the EEOC letter was unaware of this transfer, and (2) there is a difference between a hiring and a transfer. Accordingly, plaintiff's argument as to this point has little weight.

■ Eighth, plaintiff contends that (1) Whidden had no personal knowledge regarding plaintiff's skills, and (2) plaintiff's skills were the same or better than Ball's skills. (*Id.* at 49.) The first part of plaintiff's argument does not demonstrate pretext because Whidden relied upon Urban's personal knowledge of plaintiff's skills. (*See* Def.'s Br., Statement of Undisputed Facts ¶ 11; *denied in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 11.) The second part of plaintiff's argument, that his skills were the same or better than Ball's skills, is premised upon several affidavits from his coworkers. (Pl.'s Resp, Resp. to Statement of Undisputed Facts ¶¶ 17–19.) As a general matter, "[i]t is the manager's perception of the employee's performance that is relevant, not plaintiff's subjective evaluation of his own relative performance." *Furr v. Seagate Tech., Inc.,* 82 F.3d 980, 988 (10th Cir.1996). Nevertheless, affidavits from four of plaintiff's coworkers regarding plaintiff's skill is sufficient to create an issue of disputed fact whether plaintiff's performance was as good (or better) than Ball's performance.

*Minshall v. McGraw Hill Broadcasting, Co., Inc.,* 323 F.3d 1273, 1280 (10th Cir. 2003) (holding that "evidence indicating that an employer misjudged an employee's performance ... is, of course, relevant to the question of whether [the employer's] stated reason [for its actions] is ... masking prohibited discrimination") (quoting *Tyler v. Re/Max Mountain States, Inc.,* 232 F.3d 808, 813–14 [10th Cir.2000] ) (alterations in original). Thus, plaintiff's argument as to this point presents evidence of pretext.

Ninth, plaintiff maintains that defendant's statements that plaintiff's work was being phased out in 2001 and 2002 was inapposite with the fact that plaintiff's work was not phased out. (Pl.'s Resp. at 49.) The facts taken in a light most favorable to plaintiff show that plaintiff's work was not phased out. (Def.'s Br., Statement of Undisputed Facts ¶¶ 25–27; *denied in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 25–27.) Consequently, this factor leans slightly towards a showing of pretext.

Tenth, plaintiff asserts that Whidden was inconsistent in her testimony regarding when she hired Thompson and Morgan. (Pl.'s Resp. at 49–50.) Whidden's testimony was not inconsistent.

■ Eleventh, plaintiff claims that even though Whidden made the decision to hire Thompson and Morgan prior to the FMP, it is inconsistent with the FMP that she would bring them into the NPC during the FMP. (*Id.* at 50.) In other words, plaintiff raises the question why the defendant would be hiring (via transferring) new workers into a program concurrent with layoffs of employees within the same program. (*Id.*) The problem with plaintiff's argument is that it is not inconsistent for a company to try to bring in lower level managers when releasing upper level man-

agers. Plaintiff's argument as to this point is therefore without merit.

■ Twelfth, plaintiff argues that Morgan and Thompson were transferred because they had specialized knowledge of the MediaOne 5E switches, yet the people already in the NPC had been working with these switches for six months. (*Id.* at 50–51.) Without more, this argument is not persuasive because defendant has the right to choose which employees it thinks are more competent with the equipment they will be using.

Thirteenth, plaintiff contends that Urban made inconsistent statements about whether plaintiff was at risk because the work he had been performing was related to AT & T Broadband, or not related to AT & T Broadband. (*Id.* at 51.) The facts taken in a light most favorable to defendant show that Urban has been inconsistent in his position on this issue, which is a factor that shows pretext. (*See id.,* Statement of Additional Facts, Regarding ADA Claims ¶ 32; *denied at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 32.)

■ Fourteenth, plaintiff maintains that defendant failed to ask him if he was interested in applying for any of the six A–Band positions that were eventually transferred to the NPC, even though defendant had a policy that plaintiff could apply for them. (*Id.* at 51.) Plaintiff's argument fails for two reasons. First, plaintiff has provided no citation to the record to show that he was never asked if he was interested in applying for any of these positions. (*Id.,* Statement of Additional Facts, Regarding ADEA Claims ¶ 21; *denied in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 21.) Second, and more important, defendant's policy does not require that defendant ask plaintiff if he was interested in these positions. (*Id.,* Statement of Additional Facts, Regarding ADEA

Claims ¶ 20; *admitted at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 20.) Defendant, therefore, was under no duty to inform plaintiff of these positions. Plaintiff's argument as to this point, therefore, does not support a finding of pretext.

Fifteenth, plaintiff asserts that Urban is not credible for several inconsistent statements he made that were unrelated to defendant's reasons for discharging plaintiff. (*Id.* at 51.) This argument is irrelevant. At the summary judgment phase of litigation, the court must take all evidence in a light most favorable to the non-moving party, here the plaintiff. *Concrete Works,* 36 F.3d at 1518. Accordingly, if Urban's testimony as to a relevant issue contradicts the testimony of another witness, the court must credit whichever testimony favors plaintiff. Therefore, plaintiff's challenge to Urban's general credibility, while relevant at the trial phase of a civil action, is not relevant to a motion for summary judgment.

Sixteenth, plaintiff claims that one of defendant's proffered reasons for retaining Ball as opposed to plaintiff was NPC's planned shift towards project management from special projects. (Pl.'s Resp. at 51.) However, according to plaintiff, defendant continued to engage in special projects through 2003. (*Id.*) This factor leans slightly in favor of a showing of pretext.

■ Seventeenth, plaintiff argues that defendant's requirement that none of the NPC team could work VO is pretextual because Urban permitted West to work from home. (*Id.* at 52.) West, unlike the rest of the team, lived in Indiana, far away from the Colorado office where the rest of the team worked. (*Id.,* Statement of Additional Facts, Regarding ADA Claims ¶ 8; *admitted in relevant part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 8.) Furthermore, West was an

independent contractor, and he left defendant in November 2001 before Urban required that all NPC team members work exclusively from the office. (*Id.*) West, therefore, does not provide an adequate comparison to show pretext.

Although a majority of the foregoing arguments are without merit, several of these arguments, in combination, sufficiently demonstrate pretext for plaintiff to survive summary judgment. Specifically, plaintiff's first, second, eighth, ninth, thirteenth, and sixteenth arguments, taken together, tend to show that defendant's proffered legitimate non-discriminatory reasons were pretextual.

### 3. Defendant's Alleged Use of Subjective Criteria

Plaintiff contends that defendant used subjective criteria to grade his performance, and he has therefore shown pretext. (*Id.* at 52–54.) As a general matter, "[c]ourts view with skepticism subjective evaluation methods," and the Tenth Circuit has recently held that "[a]bsent evidence that [employer's] system of ranking and evaluation relies on objective criteria, we hold that [employee] has satisfied his burden to demonstrate pretext under the third prong of *McDonnell Douglas* for the purposes of avoiding summary judgment." *Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1218 (10th Cir.2002). Here, plaintiff's performance review was subjective. (Def.'s Br., Statement of Undisputed Facts ¶ 21; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 21; Pl.'s Resp., Statement of Additional Facts, Regarding ADEA Claims ¶¶ 17–18; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶¶ 17–18.) Perhaps more important, Urban's comments regarding plaintiff's work in each category in 2001 was for all intents and purposes identical to Urban's 2000 comments, yet plaintiff's numerical rating was far worse

in 2001 than in 2000. (Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 21; *admitted in relevant part at* Def.'s Reply, Reply to Resp. to Statement of Undisputed Facts ¶ 21.) Accordingly, Urban's evaluation of plaintiff demonstrates pretext sufficient for plaintiff to survive summary judgment.

### d. Conclusions on Plaintiff's ADEA Claim

Based on the foregoing, plaintiff has set forth a *prima facie* case of age discrimination. Defendant has proffered multiple legitimate non-discriminatory reasons for its selection of plaintiff for its layoffs. The facts taken in a light most favorable to plaintiff show that defendant's proffered non-discriminatory reasons are pretextual due to defendant's procedural irregularities, subjective evaluation criteria, weaknesses, inconsistencies, and contradictions. Accordingly, plaintiff's ADEA claim survives summary judgment.

### 3. Plaintiff's ADA Discrimination Claim

 Defendant argues that it is entitled to a judgment as a matter of law on plaintiff's ADA discrimination claim. (Def.'s Br. at 21–31.) In order

> [t]o establish a [discrimination] claim under the ADA, [plaintiff] must show that: (1)[ ]he is a disabled person within the meaning of the ADA; (2)[ ]he is qualified, i.e., able to perform the essential functions of the job, with or without reasonable accommodation (which [ ]he must describe); and (3) [defendant] discriminated against [him] in its employment decision … because of [his] alleged disability.

*Pack v. Kmart Corp.*, 166 F.3d 1300, 1304 (10th Cir.1999).

The ADA defines a disability as (A) a physical or mental impairment that sub-

stantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment. The statutory requirement that disability determinations be made with respect to the individual, contemplates an individualized, a case-by-case determination of whether a given impairment substantially limits a major life activity of the individual.

*Id.* (internal quotation marks omitted) (citation omitted) (quoting 42 U.S.C.A. § 12102[2] [West 1995 & Supp.2003] ). Regarding the first prong of the definition of a disability, the Tenth Circuit has defined a "major life activity" as "a basic activity that the average person in the general population can perform with little or no difficulty." *Id.* at 1305. Sleeping is a major life activity. *Id.* at 1305.

In order for a physical or mental impairment to be "substantially limiting," the individual must be:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity.

*Id.* (quoting 29 C.F.R. § 1630.2[j][1] [2003] ).

Here, plaintiff claims his major life activities are limited by his (1) frequent urination, and (2) sleeping problems. (Pl.'s Resp. at 75–76.) It is unclear whether plaintiff also claims that his Post Traumatic Stress Disorder limits his major life activities. (*Id.* at 80.) I address each of plaintiff's alleged limitations.

### a. Post Traumatic Stress Disorder

] Plaintiff's claim that his Post Traumatic Stress Disorder is a limitation on his major life activities is without merit. In order to state a claim under the ADA, plaintiff must show that defendant "discriminated against [him] in its employment decision . . . because of [his] alleged disability." *Pack*, 166 F.3d at 1304. Plaintiff was not aware that he had Post Traumatic Stress Disorder from his service in Vietnam until after defendant terminated his employment. (Def.'s Br., Statement of Undisputed Facts ¶ 38; *denied at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 82; Pl.'s Resp., Statement of Additional Facts, Regarding ADEA Claims ¶ 35; *admitted at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 35.) Therefore, defendant could not have known about his alleged disability if plaintiff himself did not know about his disability. Accordingly, plaintiff's Post Traumatic Stress Disorder will not support a claim under the ADA.

Alternatively, plaintiff asserts that his Post Traumatic Stress Disorder interfered with his sleeping. (Pl.'s Resp., Statement of Additional Facts, Regarding ADEA Claims ¶ 35; *admitted at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA Claims ¶ 35.) I extensively address plaintiff's issues with his sleeping in the following section, so his Post Traumatic Stress Disorder is, for all intents and purposes, a consideration before the court regarding his sleeping problems.

### b. Urinary Incontinence

 Plaintiff asserts that due to his cancer treatment, he had problems with urinary frequency, urgency, and incontinence. (*Id.* at 77–80.) Plaintiff's argument consists of two parts. First, plaintiff contends that his urination problems made him have to frequently go to the bathroom

at work and wear protection. Second, plaintiff maintains that his urination problem kept him awake for much of the night, thus interfering with his sleep. I address plaintiff's second argument in the next section because it deals with plaintiff's sleeping problems and fatigue. I address plaintiff's first argument herein.

Regarding plaintiff's need to frequently go to the bathroom at work and wear protection, plaintiff's main contention is that he was embarrassed by his frequent urination. (Def.'s Br., Statement of Undisputed Facts ¶ 75; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 75.) Plaintiff needed to wear protection at certain times, but he never wet his undergarments in 2001. (*Id.*, Statement of Undisputed Facts ¶ 81; *admitted in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 81.)

■ "[M]erely needing to be near a bathroom is not a limitation that rises to the level of severity, frequency and duration required for a finding of a disability under the ADA." *Sacay v. Research Found. of City Univ. of N.Y.*, 193 F.Supp.2d 611, 629 (E.D.N.Y.2002); *see also Swain v. Hillsborough County Sch. Bd.*, 146 F.3d 855, 858 (11th Cir.1998) (holding that need to frequently go to the bathroom does not establish that plaintiff has a disability under the ADA); *Sepulveda v. Glickman*, 167 F.Supp.2d 186, 191 (D.P.R.2001) (plaintiff's diabetes that "require[d] medication, a fixed meal schedule, timely snack breaks, and the opportunity to use the bathroom very frequently during the work day," did not constitute a substantial limitation on a major life activity); *Williams v. H.N.S. Mgmt. Co., Inc.*, 56 F.Supp.2d 215, 221 (D.Conn.1999) (holding that plaintiff's need to frequently urinate could only substantially limit a major life activity if restrooms were not accessible); *Clark v. Dallas Indep. Sch. Dist.*, Civ. A. No. 3:95–CV–1812G, 1996 WL 706866, at *4 (N.D.Tex. Dec.3, 1996) (holding that teacher's need to use the restroom immediately when necessary did not substantially limit her in a major life activity). Accordingly, plaintiff's allegations regarding his need to wear protection and to frequently go to the bathroom does not substantially limit a major life activity. He therefore cannot base an ADA discrimination claim upon his need to wear protection and to frequently go to the bathroom.

### c. Fatigue

■ Plaintiff asserts that he has sleeping problems, and that these sleeping problems caused fatigue when he was awake. (Pl.'s Resp. at 77–80.) Plaintiff testified in his deposition that, in the fall of 2001, he was getting at most four hours of sleep a night. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 35; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 35.) Beyond his four hours of sleep, during 2001, plaintiff also got some time to lie down/nap during the day. (Def.'s Br., Ex. A–6 at 3 [Pl.'s Answers to Def.'s Second Set of Interrogs.].)

Four hours of sleep a night, plus some napping time during the day, is not enough to be a substantial limitation under the ADA. *See Boerst v. Gen. Mills Operations, Inc.*, 25 Fed. Appx. 403, 407 (6th Cir.2002) ("Getting between two and four hours of sleep a night, while inconvenient, simply lacks the kind of severity we require of an ailment before we will say that the ailment qualifies as a substantial limitation under the ADA"); *Swanson v. Univ. of Cincinnati*, 268 F.3d 307, 316 (6th Cir.2001) ("[w]hile less than five hours sleep is not optimal, it is not significantly restricted in comparison to the average person in the general population"); *cf. Pack*, 166 F.3d at 1306 (holding that, despite plaintiff's

proffered evidence that she got two or three hours of sleep, her sleeping problems did not substantially limit her major life activity of sleeping). Thus, plaintiff cannot base a claim of ADA discrimination upon his lack of sleep and fatigue.

■] This conclusion is bolstered by plaintiff's testimony that he could still accomplish his work. Plaintiff testified that in spite of his fatigue he did not have performance problems at work. (Def.'s Br., Statement of Undisputed Facts ¶ 80; *denied at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 80; Def.'s Br., Ex. Pl.'s Dep. at 143 11. 11–12, 456 11. 14–17 [Plaintiff's Dep.].) Where an employee's lack of sleep does not affect his performance, his lack of sleep does not substantially limit a major life activity. *Steele v. Thiokol Corp.*, 241 F.3d 1248, 1254 (10th Cir.2001) ("[plaintiff] asserted that he is often awake for some time in the middle of the night, 'which causes me a great deal of fatigue during the day.' [Since plaintiff] offered no evidence that his sleep problems made it difficult for him to go to work and do his job well ... the district court correctly concluded there was insufficient evidence that [plaintiff's] major life activity of sleeping was sufficiently limiting to survive summary judgment") (citation omitted); *Katekovich v. Team Rent A Car of Pittsburgh, Inc.*, 36 Fed. Appx. 688, 690 (3rd Cir.2002) ("[plaintiff's] own testimony did not demonstrate that she was substantially impaired. [While plaintiff] did claim that, because of her sleep disorder, she had difficulty in staying awake during the day ... she testified that she can perform her normal duties. Because there was insufficient evidence that would demonstrate that [plaintiff] was substantially limited in any way, much less in any major life activity, her difficulty in staying awake cannot be a disability"). Accordingly, plaintiff's testimony that his fatigue did not cause performance problems at work

demonstrates that he was not substantially limited in a major life activity.

For the reasons set forth above, plaintiff cannot show that he was substantially limited in a major life activity. Accordingly, plaintiff was not disabled under the ADA and consequently cannot survive summary judgment on his ADA discrimination claim.

### 4. *Plaintiff's ADA Retaliation and Interference Claims*

■] Defendant contends that plaintiff cannot state a claim for retaliation under the ADA because Whidden decided to place plaintiff at risk for the FMP without knowledge of defendant's request for an accommodation. (Def.'s Br. at 22–23.) Defendant sets forth an identical argument regarding plaintiff's interference claim under the ADA. (*Id.* at 30–31.) As a preliminary matter, the fact that plaintiff is not disabled under the ADA, as discussed above, does not mean that he cannot state a claim for retaliation or interference under the ADA. As the Tenth Circuit has explained "in order to prosecute an ADA retaliation claim, a plaintiff need not show that she suffers from an actual disability. Instead, a reasonable, good faith belief that the statute has been violated suffices." *Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1264 (10th Cir.2001); *see also Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 502 (3d Cir.1997) ("a plaintiff in an ADA *retaliation* case need not establish that he is a 'qualified individual with a disability.' By its own terms, the ADA retaliation provision protects 'any individual' who has opposed any act or practice made unlawful by the ADA or who has made a charge under the ADA") (emphasis in original).

■ The ADA prohibits retaliation in opposition to protected activity, explaining that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice

made unlawful by this chapter." 42 U.S.C.A. § 12203(a) (West 1995 & Supp. 2003). The ADA also prohibits interference with an individual's ADA rights, explaining that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of ... any right granted or protected by this chapter." 42 U.S.C.A. § 12203(b).

> Under the ADA, an employee must prove the following elements in order to establish a prima facie case of retaliation: (1) that she engaged in an activity protected by the statute; (2) that she was subjected to [an] adverse employment action subsequent to or contemporaneous with the protected activity; (3) that there was a causal connection between the protected activity and the adverse action. As with claims for discriminatory discharge, if the plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a nondiscriminatory reason for the adverse employment action. If the employer satisfies this burden of production, then, in order to prevail on her retaliation claim, the plaintiff must prove that the employer's articulated reason for the adverse action is pretextual, i.e. unworthy of belief.

*Selenke,* 248 F.3d at 1264 (internal quotation marks omitted) (citations omitted) (alteration in original). The Tenth Circuit treats ADA retaliation and ADA interference claims in the same manner. *See, e.g., id.; Butler v. City of Prairie Vill.,* 172 F.3d 736, 751–52 (10th Cir.1999).[6]

Defendant does not challenge that plaintiff had a good faith belief that defendant violated the ADA. Nor does the defendant challenge that plaintiff's request for a VO was protected under the statute. Rather, defendant only challenges the third prong of plaintiff's *prima facie* case, a causal connection between the protected activity and the adverse action. (Def.'s Br. at 22–23.)

 Defendant sets forth two arguments why plaintiff has not established a causal connection. First, defendant contends that plaintiff's protected opposition occurred on January 2, 2002, after Whidden made her decision to place plaintiff at risk for the FMP. (*Id.*) However, as discussed above, it is an issue of disputed material fact whether Whidden made her decision before or after January 2, 2002. (*Id.,* Statement of Undisputed Facts ¶ 9; *denied in pertinent part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 9; Pl.'s Resp. at 47; Pl.'s Resp., Ex. 3 at Martin 0003–0004 [EEOC letter].) Second, defendant argues that Whidden was unaware of the fact that plaintiff had sought an accommodation, i.e., engaged in the protected activity. (*Id.* at 21–22.) The facts taken in a light most favorable to plaintiff, however, show that (1) virtually all of the information upon which Whidden made her decision to place plaintiff at risk was based upon information provided by Urban, and (2) Urban knew of plaintiff's protected opposition. (*Id.,* Statement of Undisputed Facts ¶¶ 11, 17–18, 21, 28; *admitted in part, denied in part at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶¶ 11, 17–18, 21, 28; Pl.'s Resp., Statement of Additional Facts, Regarding ADEA Claims ¶¶ 17–19; *admitted in part, denied in part at* Def.'s Reply, Reply to Additional Facts, Regarding ADEA

---

**6.** Plaintiff challenges the rationale of the *Selenke* decision on this ground. (Pl.'s Resp at 87–90.) The Ninth Circuit has also challenged the validity of *Selenke* and *Butler* on this basis. *Brown v. City of Tucson,* 336 F.3d 1181, 1189 n. 13 (9th Cir.2003). The law in the Tenth Circuit is clear on this issue, however, so I decline plaintiff's invitation to reject *Selenke.*

Claims ¶¶ 17–19.) Defendant cannot escape liability simply because Whidden may not have had retaliatory intent, if plaintiff's boss, Urban, had such intent and supplied Whidden with false or distorted information that led her to place plaintiff at risk for the FMP. *See Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1231 (10th Cir.2000) ("a defendant may be held liable if the manager who discharged the plaintiff merely acted as a rubber stamp, or the 'cat's paw,' for a subordinate employee's prejudice, even if the manager lacked discriminatory intent"). Accordingly, defendant's arguments that plaintiff cannot establish a *prima facie* case of ADA retaliation and ADA interference fails.

■■■■■ Although defendant does not raise any other issues regarding causal connection, I briefly note that plaintiff has demonstrated a sufficient causal connection. Plaintiff can show a causal connection when the alleged retaliation occurs in close temporal proximity to the protected opposition. *Hysten v. Burlington N. and Santa Fe Ry. Co.*, 296 F.3d 1177, 1184 (10th Cir.2002) (holding that three months between protected opposition and retaliation is insufficient alone to meet causal connection burden because "'unless the termination is *very closely* connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation'") (quoting *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 [10th Cir. 1999]) (emphasis in original); *O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1255 (10th Cir.2001) ("Because this adverse action followed the protected conduct by one day, a causal connection is established"); *Burrus v. United Tel. Co. of Kan., Inc.*, 683 F.2d 339, 343 (10th Cir.1982) ("The causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by ad-

verse action). Here, one day after plaintiff requested the VO from Woldman, Urban gave plaintiff the highly critical counseling memorandum." (Def.'s Br., Statement of Undisputed Facts ¶ 74; *admitted at* Pl.'s Resp., Resp. to Statement of Undisputed Facts ¶ 74; Pl.'s Resp., Statement of Additional Facts, Regarding ADA Claims ¶ 19; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 19; Pl.'s Resp., Ex. 4 [Letter of Counsel].) Immediately thereafter, Urban kept daily track of plaintiff's alleged work deficiencies and lack of time working. (Pl.'s Resp., Statement of Additional Facts, Regarding ADA Claims ¶ 24; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 24; Pl.'s Resp., Ex. 23 [Documentation of Counsel].) Then, seven days after plaintiff's complaint, Urban issued plaintiff his performance appraisal, which dropped plaintiff's actual ratings from above average to average. (*Id.*, Statement of Additional Facts, Regarding ADA Claims ¶ 25; *admitted in pertinent part at* Def.'s Reply, Reply to Additional Facts, Regarding ADA Claims ¶ 25.) Nine days after this defendant designated plaintiff as at risk for the FMP. (*Id.*, Statement of Additional Facts, Introductory or Jurisdictional Matters ¶ 4; *admitted at* Def.'s Reply, Reply to Additional Facts, Introductory or Jurisdictional Matters ¶ 4.) These rapid actions taken by defendant immediately after plaintiff's protected opposition is sufficient to establish a causal connection to survive a summary judgment challenge.

For the reasons set forth above regarding plaintiff's ADEA claim, defendant has proffered several legitimate nondiscriminatory reasons for its decision to discharge plaintiff. For the reasons also set forth above regarding plaintiff's ADEA claim, the facts taken in a light most favorable to plaintiff show that defendant's proffered non-discriminatory reasons are pretextual

due to procedural irregularities, subjective evaluation criteria, weaknesses, inconsistencies, and contradictions. Accordingly, plaintiff's ADA retaliation and interference claims survive summary judgment.

### 5. Motion to Strike

 Plaintiff moves to strike portions of defendant's summary judgment reply brief. (Pl.'s Mot. to Strike.) Plaintiff contends that defendant improperly included numerous reply affidavits, new arguments, and new expert opinions in its reply brief. (*Id.*)

For the reasons set forth above, defendant does not prevail on summary judgment regarding plaintiff's first, third, and fourth claims for relief. Accordingly, plaintiff's motion to strike is moot as to these claims.

For the reasons set forth above, plaintiff's second claim for relief, ADA discrimination, fails because plaintiff does not have any disabilities that qualify under the ADA. This conclusion, and the reasons supporting this conclusion, do not rely upon any portion of defendant's reply brief that plaintiff finds objectionable. Accordingly, plaintiff's motion to strike is moot as to this claim.

### 6. Conclusions

Based on the foregoing it is therefore

ORDERED as follows:

1. Defendant's Motion for Summary Judgment (# 31) is GRANTED in part and DENIED in part. Defendant's Motion for Summary Judgment is GRANTED as to plaintiff's second claim for relief, ADA discrimination. Defendant's Motion for Summary Judgment is DENIED as to plaintiff's first claim for relief, ADEA discrimination, plaintiff's third claim for relief, ADA retaliation, and plaintiff's fourth claim for relief, ADA interference.

2. Plaintiff's Motion to Strike Defendant's Reply Brief (# 42) is DENIED as moot.

3. The final judgment entered at the conclusion of the case will include judgment in favor of defendant and against plaintiff on plaintiff's second claim for relief, ADA discrimination.

4. The court will hold a Final Pretrial Conference commencing at 2:45 o'clock p.m. on September 17, 2004, in Courtroom 14, Alfred A. Arraj United States Courthouse, Denver, Colorado. In preparing for and participating in the conference, the parties and counsel will follow the Instructions for Preparation and Submission of Final Pretrial Order, a copy of which is attached.